# EXHIBIT B

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| **EFD SPORTS, LLC,** | § | |
| *Plaintiff*, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:24-CV-87-SDJ** |
| | § | |
| | § | |
| | § | |
| **BALLY'S CORPORATION,** | § | |
| *Defendant.* | § | |

## AFFIDAVIT OF SEAN SARSFIELD

| | | |
|---|---|---|
| STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF HARRIS | § | |

BEFORE ME, the undersigned notary public in and for the State of Texas, on this day personally appeared SEAN SARSFIELD, the affiant, a person whose identity is known to me and whose name is subscribed below. After I administered an oath to affiant, affiant testified:

1.      "My name is Sean Sarsfield. I am over the age of eighteen (18) years, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2.      I have been retained as an expert witness by the Defendant in this action.  I have prepared a report in this action containing my credentials, identifying the documents and materials I relied upon, and setting forth my opinions in this case, including my opinions regarding the deficiencies in Scott Hakala's report.  Attached to this affidavit is a true and correct copy of my report, excluding the attachments and exhibits thereto.  This report provides a detailed analysis of

my evaluation of Mr. Hakala's methodologies and conclusions. If called to testify, I would provide testimony consistent with the findings and opinions presented in my report.

3.       Based on my education and experience, it is my opinion that Scott Hakala's projections are speculative, rely on assumptions that are unsupported, do not align with the facts of the case, and cannot be reasonably relied upon.

4.       Mr. Hakala's opinions on damages are speculative, not reasonable, and cannot reasonably be relied upon. Specifically, Mr. Hakala:

- Does not base his opinions on sufficient facts or data.

- Uses flawed revenue projection methodology.

- Uses inappropriate cost of capital inputs.

- Fails to properly analyze the market.

- Uses inappropriate scenarios in his analysis.

5.       Based on Mr. Hakala's report and supporting schedules, it is clear he did not rely on the facts present in this case or obtain sufficient relevant data to make a reasonable estimate of damages in the matter. He provides no explanation for the bulk of the assumptions present in this calculation. By his own admission, the financial information he received from EFD Sports, LLC ("EFD") "were not in good order." However, he still relied on the income statement information in forming his opinions.

6.       Mr. Hakala failed to provide an opinion or provide any support for EFD's alleged costs incurred to demonstrate the usability and stability of their product.

7.       There is no indication that Mr. Hakala performed any independent due diligence on the information provided or of any research of the assumptions present in his calculation.

8.      As the basis for his projections, Mr. Hakala relies on statistics from the web site Statista which details the number of individuals in the United States that participate in boxing and MMA. Mr. Hakala appears to be double counting the potential customers in his calculation as the boxing participation numbers used by Mr. Hakala already include MMA participants. Therefore, by adding a separate calculation for the number of MMA participants he appears to be double counting those individuals in his calculation. Also, the statistics relied on by Mr. Hakala for the number of "boxing participants" appear to include both Core and Casual participants, including individuals that may have only tried boxing once or twice (in their lives) as a potential customer for StrikeTec.

9.      Mr. Hakala's projections assume that the annual revenues for EFD would increase from approximately $79,000 in 2021 to $1.69 million in 2022, an increase of over 2,000%. Looking at the timeline of EFD's communication with Bally's, an agreement was still being negotiated as late as November 2021, the finalization and execution of any agreement was unlikely to occur until sometime in 2022, if at all, and EFD had noted supply chain delays. Mr. Hakala fails to provide any support that would justify an increase in revenues of this magnitude, nor does he demonstrate that EFD had the existing infrastructure and support network to reasonably justify these projections.

10.     In his calculation, Mr. Hakala inappropriately selects guideline companies to be used in his analysis. The four companies Hakala selected are Garmin Ltd., Apple Inc., Nike, Inc., and Lululemon Athletica Inc. I have reviewed each selected guideline company and conclude that these companies are not comparable to EFD. Each are publicly traded companies, with long track histories, established worldwide market, sales force, and reputation. In addition, each are well

capitalized and diversified in the products that they sell. They are not comparable and therefore not appropriate to use in an evaluation of any alleged damages of EFD.

11.    It is therefore my opinion that the methodology and conclusions reached by Mr. Hakala are not reasonable and is not based on reliable information.

FURTHER AFFIANT SAYETH NAUGHT.

SIGNED on _____2/17/2025_____.



Signed by:

*Sean Sarsfield*

1ECA2588D1D644B...

SEAN SARSFIELD

SUBSCRIBED AND SWORN TO BEFORE ME the undersigned Notary Public, on _____2/17/2025_____.

DocuSigned by:

*vanessa bench*

739BC06416A9444...

VANESSA BENCH
NOTARY PUBLIC
STATE OF TEXAS
Commission #270823-4
My Comm. Expires February 9, 2027

NOTARY PUBLIC in and for the State of Texas
My Commission Expires: ____February 9, 2027____

*Confidential*

**United States District Court**
For the Eastern District of Texas
Sherman Division

| | | |
|---|---|---|
| **EFD SPORTS, LLC,** | § | |
|  **Plaintiff,** | § | |
| | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:24-cv-87-sdj** |
| | § | |
| | § | |
| **BALLY'S CORPORATION,** | § | |
|  **Defendant.** | § | |

**EXPERT REPORT OF SEAN SARSFIELD**

February 10, 2025

Expert Report of Sean Sarsfield

*Confidential*

# **Table of Contents**

I.      QUALIFICATIONS ...................................................................................................... 4

II.     SCOPE OF SERVICES ................................................................................................ 4

III.    COMPENSATION ........................................................................................................ 5

IV.     INFORMATION AND MATERIALS PROVIDED AND RELIED UPON ................ 5

V.      SUMMARY OF OPINIONS ......................................................................................... 5

VI.     BACKGROUND ............................................................................................................ 6

VII.    REVIEW AND ANALYSIS OF PLAINTIFF'S DAMAGES ...................................... 7

        1.      Mr. Hakala's Opinions are Not Based on Sufficient Facts or Data ................ 8

        2.      Flawed Revenue Projection Methodology ...................................................... 10

        3.      Inappropriate Cost of Capital Inputs ............................................................. 13

        4.      Failure to Analyze the Product and Market .................................................. 14

        5.      Unreasonable Approach Use .......................................................................... 15

        6.      EntroBox LLC Scenario ................................................................................. 15

VIII.   Affirmative Damage Analysis ..................................................................................... 16

IX.     CONCLUSION ............................................................................................................. 16

Expert Report of Sean Sarsfield

*Confidential*

## **List of Exhibits**

| Letter | Description |
| --- | --- |
| A | Curriculum Vitae of Sean Sarsfield |
| B | Documents Provided and Considered |

Expert Report of Sean Sarsfield

*Confidential*

# I.    QUALIFICATIONS

I am a Principal at HKA.  I am a Certified Public Accountant licensed in the States of Texas, Michigan, and New York.  I am or have been a member of numerous professional societies, including the American Institute of Certified Public Accountants ("AICPA"), the Texas Society of Certified Public Accountants ("TXCPA"), the Association of Certified Fraud Examiners ("ACFE"), the National Association of Certified Valuators and Analysts ("NACVA"), and the Turnaround Management Association.  I am a Certified Fraud Examiner, a designation from the ACFE, a Certified Valuation Analyst, a designation from NACVA, and I hold the designation Certified in Financial Forensics from the AICPA.  I am currently the chair of the TXCPA's Business Valuations, Forensic, and Litigation Services Committee.

I have never been the subject of any grievance or disciplinary action by any of the licensing or certifying bodies to which I am accountable.  For more than twenty years, I have held various positions providing forensic accounting, business interruption, and litigation support services.  I have been designated as an expert witness and qualified to testify by report and/or testimony in federal and state courts or arbitrations in commercial matters.

My curriculum vitae, which summarizes my qualifications and professional experience, including testimony experience is attached as **Exhibit A**.

# II.    SCOPE OF SERVICES

HKA has been retained by the law firm Phelps Dunbar LLP ("Counsel" and "Phelps") on behalf of their client Bally's Corporation ("Bally's") to provide expert services and testimony in connection with a lawsuit filed on January 31, 2024.[1]

I have been asked by Counsel to review, analyze, and provide an opinion regarding damages calculated by Scott Hakala ("Hakala Report").  I've also been asked to evaluate claims made by the Plaintiff for alleged costs incurred relating to StrikeTec during negotiations.  Finally, I've been asked to offer my own opinion on damages in this matter.

---

[1] EFD Sports, LLC v. Bally's Corporation, in the Eastern District Court of Collin County, Texas Civil No. 4:24-CV-87-SDJ.

Expert Report of Sean Sarsfield

*Confidential*

## III.    COMPENSATION

HKA is being compensated for my time in this matter at an hourly rate of $675.  Rates of consultants working under my direction range from $195 to $750.  Neither my nor HKA's compensation is dependent on the outcome of this matter.

## IV.    INFORMATION AND MATERIALS PROVIDED AND RELIED UPON

In connection with my analysis, I relied on information and documents provided by the parties to this litigation, various pleadings, discussions with Counsel, publicly available information about the parties (see **Exhibit B**), and my own education, training and experience analyzing similar issues as those raised in this case.  This report, which sets forth my qualified opinions and the basis for those qualified opinions, relies on the information available, reviewed, and analyzed as of February 10, 2025.[2]

Since discovery is ongoing and no depositions have occurred, it is likely that additional information will be available for my review and consideration. I reserve the right to supplement or amend this report based on additional relevant information that I receive, including additional documents produced in this matter, depositions, testimony, admissions, or other relevant evidence.

In connection with my anticipated trial testimony in this action, I may create summaries and/or demonstrative exhibits which refer to or relate to the matters discussed in this report, or in my deposition testimony. I have not yet created such exhibits as of this report's date.

## V.    SUMMARY OF OPINIONS

Based on my analysis of the information available to date, it is my opinion that:

EFD Sports, LLC ("EFD" or "Plaintiff") has no damages in this matter as evidenced by the facts of the case and the calculation of their own expert in Scenario 1 of the Hakala Report. Mr. Hakala's projections in Scenarios 2 and 3 are speculative, rely on assumptions that are unsupported, don't align with the facts of the case and cannot be relied upon.  Further, Mr. Hakala failed to provide an opinion or provide any support for EFD alleged costs incurred to demonstrate the usability and stability of their product.

---

[2] As used herein, other than references to my education and experience, "I" and "We" shall mean either I personally or those HKA personnel under my supervision. Also, "My", "Our", and "Us" shall also refer to actions taken by me personally or by those HKA personnel under my supervision.

Expert Report of Sean Sarsfield

*Confidential*

# VI.   BACKGROUND

In early 2021, Soo Kim, on behalf of Bally's Corporation, connected with Wes Elliott, owner of EFD.[3]

According to the First Amended Complaint, EFD developed and owns technology known as "StrikeTec" that integrates software and hardware into sensors worn by boxing or Mixed Martial Arts ("MMA") fighters allowing the measurement and analysis of strikes and the strike force generated by the puncher.[4]

Plaintiffs allege Mr. Kim reached out to Mr. Elliott regarding the StrikeTec technology to potentially integrate it with Bally's existing application known as Monkey Knife Fight (the "Project").[5]

Plaintiffs believed the integration of the two products would allow betting through Bally's application and in live arenas based on the measurements gathered by StrikeTec during live fights broadcasted by Bally's media.[6]

According to Plaintiffs, in May 2021, Elliott began discussions with Adi Dhandhania, former Chief Operating Officer (COO) of Bally's, on a proof-of-concept.[7]

According to Plaintiff's First Amended Complaint, they were offered a partnership opportunity with EntroBox, LLC ("EntroBox") on June 7, 2021, for marketing and development of StrikeTec.[8] Plaintiffs allege the EntroBox opportunity was purportedly worth approximately $3 million.[9]

On June 24, 2021, negotiations began between Mr. Elliott, Mr. Kim, and Mr. Dhandhania and a Scope of Work ("SOW") was requested.[10]

On July 1, 2021, Mr. Elliott produced a proposed SOW with a proposed budget of $10 million.[11]

In an email dated July 13, 2021, Mr. Soo stated "We are committed, and we are willing to commit the budget you are asking for to get it done."[12] Further, Mr. Soo stated Bally's preferred to budget each element of the Project as opposed to writing "a large check".[13]

---

[3] Plaintiff's First Amended Complaint (the "Complaint"), paras. 3.2-3.4
[4] Plaintiff's First Amended Complaint (the "Complaint"), paras. 3.1-3.2
[5] Plaintiff's First Amended Complaint (the "Complaint"), paras. 3.5
[6] Plaintiff's First Amended Complaint (the "Complaint"), paras. 3.5
[7] Plaintiff's First Amended Complaint (the "Complaint"), paras. 3.6
[8] Plaintiff's First Amended Complaint (the "Complaint"), paras. 3.8
[9] Plaintiff's First Amended Complaint (the "Complaint"), paras. 3.10
[10] Plaintiff's First Amended Complaint (the "Complaint"), paras. 3.12
[11] Plaintiff's First Amended Complaint (the "Complaint"), paras. 3.14
[12] Plaintiff's First Amended Complaint (the "Complaint"), paras. 3.15
[13] Plaintiff's First Amended Complaint (the "Complaint"), paras. 3.15

Expert Report of Sean Sarsfield

*Confidential*

Plaintiffs allege throughout July 2021, various conversations occurred between the parties regarding the SOW, funding, and timeline of the Project.[14]

On August 9, 2021, a Zoom call between the parties occurred where SOW revisions and technology issues were discussed.[15] During the Zoom call, Mr. Dhandhania's colleague Sina Miri, requested additional testing. Around this time, Mr. Elliott provided data via a Google Drive.[16]

On August 10, 2023, a revised SOW was circulated by Mr. Elliott.[17]

In September 2021, a Technology Licensing Agreement was presented to EFD.[18]

On September 29, 2021, the parties in addition to EFD's attorney, Dave Steiner, met via Zoom to discuss changes to the Technology Licensing Agreement.[19]

On October 1, 2021, Mr. Dhandhania and Sina received a final draft of the Technology Licensing Agreement from EFD.[20]

In November 2021, Bally's indicated they would not be moving forward with the Project.[21]

# VII.  REVIEW AND ANALYSIS OF PLAINTIFF'S DAMAGES

HKA was provided and reviewed Scott Hakala's damages report and supporting schedules on behalf of EFD.  Mr. Hakala appears to calculate damages to EFD based largely on unsupported assumptions and facts not present in this case.

As discussed further below, Mr. Hakala's opinions on damages are speculative and thus, can't reasonably be relied upon.  More specifically, Mr. Hakala:

    1. Does not base his opinions on sufficient facts or data

    2. Uses flawed revenue projection methodology

---

[14] Plaintiff's First Amended Complaint (the "Complaint"), paras. 3.16-3.19
[15] Plaintiff's First Amended Complaint (the "Complaint"), paras. 3.20
[16] Plaintiff's First Amended Complaint (the "Complaint"), paras. 3.21
[17] Plaintiff's First Amended Complaint (the "Complaint"), paras. 3.22
[18] Plaintiff's First Amended Complaint (the "Complaint"), paras. 3.23
[19] Plaintiff's First Amended Complaint (the "Complaint"), paras. 3.25
[20] Plaintiff's First Amended Complaint (the "Complaint"), paras. 3.26
[21] Plaintiff's First Amended Complaint (the "Complaint"), paras. 3.27 and 3.29

Expert Report of Sean Sarsfield

*Confidential*

   3. Uses inappropriate cost of capital inputs

   4. Fails to properly analyze the market

   5. Uses inappropriate scenarios in his analysis

   6. Incorrectly includes EntroBox as a lost opportunity scenario

### 1.  Mr. Hakala's Opinions are Not Based on Sufficient Facts or Data

<u>*Federal Rules of Evidence*</u>

Federal Rules of Evidence Rule 702, states that an expert witness should demonstrate that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.[22]

Based on Mr. Hakala's report and supporting schedules, it is clear he did not rely on the facts present in this case or obtain sufficient relevant data to make a reasonable estimate of damages in the matter. He provides no explanation for the bulk of the assumptions present in his calculation. By his own admission, the financial information he received from EFD "were not in good order."[23] However, he still relied on the income statement information in forming his opinions.[24]  He also relied on the representations of Wes Elliott, the owner of EFD, and then made assumptions about the future performance based on those representations.[25]  For example, Mr. Hakala used Nike and Peloton as proxies for his capital expenditure projections based on a conversation with Mr. Elliott where Mr. Elliott stated that EFD's business structure was similar to the two multinational companies.[26]  Both of these are publicly traded companies, with a long track history, established worldwide market and reputation, that are well capitalized, and sell

---

[22] 28 US Code - Federal Rules of Evidence, Rule 702. Testimony by Expert Witnesses
[23] Hakala Report, para. 6.
[24] Hakala Report, Schedule A.1.
[25] See for example, Hakala Report, para. 12.a.
[26] Hakala Report, para. 13.h.

Expert Report of Sean Sarsfield

*Confidential*

diversified products.  It does not appear that he performed any independent due diligence on the information provided nor did he research any of the assumptions present in his calculation.  While it is widely understood in the expert witness industry that the use of assumptions in analyses is often necessary, it is important that those assumptions be reasonable and justified.[27]

## *New Business Rule*

Some states' statutes include a "new business rule" that precludes a new business from seeking lost profits because of the level of speculation involved and the difficulty in obtaining reasonable certainty in making such a claim.[28] Startup companies lack historical operating results, making it difficult to measure lost profits without speculation.[29] To be admissible evidence, damage analyses must be based on relevant and reliable factual bases, not speculative assumptions.[30]

While many jurisdictions have moved away from the "new business rule", they still only allow the recovery of lost profits 'when a reasonable estimate of damages can be made based on an analysis of the profits of identical or similar businesses operating under substantially the same market conditions'.[31] Further, claimants must meet the required burden of proof for courts to consider their claims.[32] New businesses generally will have a difficult time proving they would have been profitable but for the defendant's conduct.[33]

In the case of EFD, this was an unproven product, both for EFD and its competitors (as discussed further below) as it never gained traction with consumers.  My understanding is that EFD collaborated with various MMA and boxing organizations, but none of those opportunities turned into long term relationships.  Further, it was unclear if any of those organizations would have allowed the device to be used on a regular basis in sanctioned fights.

---

[27] Fannon, Nancy J., et al. "The Comprehensive Guide to Economic Damages." BV Resources, Sixth Edition. pg. 186

[28] Fannon, Nancy J., et al. "The Comprehensive Guide to Economic Damages." BV Resources, Sixth Edition. pg. 280

[29] Fannon, Nancy J., et al. "The Comprehensive Guide to Economic Damages." BV Resources, Sixth Edition. pg. 359

[30] Fannon, Nancy J., et al. "The Comprehensive Guide to Economic Damages." BV Resources, Sixth Edition. pg. 359

[31] Fannon, Nancy J., et al. "The Comprehensive Guide to Economic Damages." BV Resources, Sixth Edition. pg. 361

[32] Fannon, Nancy J., et al. "The Comprehensive Guide to Economic Damages." BV Resources, Sixth Edition. pg. 361

[33] Fannon, Nancy J., et al. "The Comprehensive Guide to Economic Damages." BV Resources, Sixth Edition. pg. 361

Expert Report of Sean Sarsfield

*Confidential*

EFD's historical financial data does not reflect a company with consistent operations. For example, EFD's Revenue for the years ended December 31, 2019, 2020, and 2021, was $4,909, $20,122, and $78,991, respectively.[34] Further, EFD's Income Statements show no profit during these same periods.[35]

### 2. Flawed Revenue Projection Methodology

*Basis for Projections - Boxing*

As the basis for his projections, Mr. Hakala relies on statistics from the web site Statista which details the number of individuals in the United States that participate in boxing and MMA.[36]  The statistics relied on by Mr. Hakala for the number of "boxing participants" appear to include both Core and Casual participants, with the categories based on the number of practices each individual participates in during the year.[37] Statista includes two categories of participants, Core participants who participate more than 26 times in a year and Casual participants, who practice 25 times or less in a year.

To put it into context, by including the Casual participants category in his projections, Mr. Hakala is including individuals that may have only tried boxing once or twice (in their lives) as a potential customer for StrikeTec. Also, when comparing the number of individuals who box in the United States from Schedule B.1 of the Hakala Report to the data on the Statista web site, I noted that the participation numbers for boxing also include MMA participants.[38]  In other words, Mr. Hakala appears to be double counting the potential customers in his calculation.

*Basis for Projections – Mixed Martial Arts*

Similar to the basis for his boxing projections, Mr. Hakala also relies on data from Statista as a basis for the number of participants in MMA.  Unlike Boxing, the data provided for MMA does not differentiate between Casual and Core participants, rather it includes any respondent that participated in MMA at least once in a given year.  In other words. Mr. Hakala is again potentially including people who tried MMA only once (in their lives) as potential customers.  Although there is a possibility that an individual could purchase the StrikeTec product after one participation, the likelihood is much lower than a Core boxing participant.

---

[34] Hakala Report, Schedule A.1.
[35] Hakala Report, Schedule A.1.
[36] Statista is a German company that provides global data and business intelligence information.
[37] Casual participants refers to individuals who practice the sport up to 25 times in the year, whereas Core participants refers to individuals who practice the sport 26 times or more.
[38] https://www.statista.com/statistics/191905/participants-in-boxing-in-the-us-since-2006/

10

Expert Report of Sean Sarsfield

*Confidential*

<u>*Participation Rate*</u>

Using the total population of those that participate in boxing and MMA in the United States, Mr. Hakala allegedly calculates the percentage of the total population in the United States which he deems the "Addressable Market" or the target demographic for StrikeTec's consumer product. He then selects what appears to be various countries at random and applies a participation rate to their respective populations that is half of the rate he uses for the United States. Applying the participation rate to the United States and various other countries, he arrives at what he deems the Total Addressable Market ("TAM") or what I assume is his global target demographic for StrikeTec. Based on the information provided in his report, there does not appear to be any justification for the countries selected nor the logic of applying half of the participation rate for the United States to random countries. Again, Mr. Hakala has failed to provide any support or justification for the assumptions and calculations performed.

<u>*Penetration Rate*</u>

Once Mr. Hakala arrives at the total population of participants in boxing and MMA in the United States and various other counties, he applies what he calls a "penetration rate". This rate appears to be the percentage of the target market or TAM that he assumes will purchase the StrikeTec product. Mr. Hakala applies a different rate in each scenario (0.025% for Bally's and 0.01% for Entrobox), again with no justification or support as to how he determined the rate. He then assumes that the penetration rate would increase in subsequent years and will eventually level out.

Mr. Hakala assumes that the penetration rate for both types of participant (boxing vs. MMA) would be the same, again with no support for his assumptions. He does not provide evidence that there has been any meaningful conversations regarding the adaptation of the StrikeTec technologies in MMA competition similar to boxing. Mr. Hakala fails to demonstrate why the penetration rate would be similar for the two sports, despite the fact that EFD's recent focus appeared to be in the boxing world.

<u>*SOW timing vs. Projections – Bally's*</u>

Under the Bally's scenario, Mr. Hakala's projections assume that the annual revenues for EFD Sports would increase from approximately $79,000 in 2021 to $1.69 million in 2022, an increase of over 2,000%. Looking at the timeline of EFD Sport's communications with Bally's, an agreement was still being negotiated as late as November 2021[39], and the finalization and execution of any agreement is unlikely to

---

[39] Plaintiff's First Amended Complaint

11

Expert Report of Sean Sarsfield

*Confidential*

occur until sometime in 2022, if at all.  Mr. Elliot had also provided information in 2021 that the supply chain was slowing, and availability of necessary components was delaying potential delivery dates.[40]

Regardless, Mr. Hakala fails to provide any support that would justify an increase in revenues of this magnitude, nor does he demonstrate that EFD Sports had the existing infrastructure and support network to reasonably justify these projections.  At a minimum, Mr. Hakala is silent to existing/contemplated agreements with manufacturer(s), distributor(s), advertiser(s) and any other parties that would be necessary to distribute StrikeTec product.

*Cost of Goods Sold Projections*

Mr. Hakala next projects cost of goods sold based on his assumption of bulk versus non-bulk pricing.  He states that the per unit cost without bulk pricing would be $127.05 and bulk pricing is $75 per unit.  He assumes bulk pricing would not be achieved in year 1 to due the need to scale up the business.  He then arbitrarily applies the non-bulk cost to half of the revenue and the bulk cost to the other half of the revenue. He makes no mention of why he believes it would be split evenly between bulk and non-bulk costs.[41]

*Operating Expense Projections*

The next step in his DCF model is to determine the operating expenses to apply to his scenarios.  He uses an industry research tool, RMA, to determine the average operating expenses for two separate industries to account for EFD's business segments.  He first calculates the operating expenses attributable to the hardware sales based on the sports and athletic manufacturing industry average expenses as a percentage of revenue for companies with sales between $10 million and $25 million.  He applies a 34% operating expense as a percentage of revenue across all projected periods in his Bally's and EntroBox scenarios.[42] He then applies the same methodology using the software publishers industry average expenses as a percentage of revenue for $5 million to $10 million companies to determine the operating expenses attributable to the subscription service EFD offers.[43]  He again applies a 70% operating expense as a percentage of revenue across all projected periods for the same scenarios as the hardware expense.[44] Historical financial information from Hakala Schedule A.1 shows operating expenses equal to between approximately 500% to 2,500% of revenue.  Given that EFD Sports' historical performance has such high operating expenses, it is confusing why Mr. Hakala gave no credence to the historically inefficient operating

---

[40] Exhibit 4 7-13-21- July 2021 Soo Kim agreement to Scope of Work.pdf, pg. 4 and BC000786
[41] Hakala Report, para. 13.e-f.
[42] Hakala Report, Schedules B.2-2, B.2-3
[43] Hakala Report, para. 13.g.
[44] Hakala Report, Schedules B.2-2, B.2-3

Expert Report of Sean Sarsfield

*Confidential*

manner. In 2021, operating expenses accounted for almost 700% of revenue. It is unreasonable to assume that the very next year, the company could go from 700% to less than 50% on a combined basis. This operating expense assumption is not based in reality and therefore unreliable.[45]

The last step Mr. Hakala goes through is to add to operating expenses a fixed annual app maintenance estimate. There is no additional information provided in his narrative nor additional detail in his analysis that discusses where this estimate came from or how much he is attributing to it.[46]

### 3.  Inappropriate Cost of Capital Inputs

In his calculation, Mr. Hakala selected four companies to help him determine a component of his weighted average cost of capital (WACC) used in his analysis. Given that the goal is to estimate the subject company's volatility by using the market it operates in, it is important to select guideline companies indicative of the industry in which the subject operates.[47] These four companies are Garmin Ltd., Apple Inc., NIKE, Inc., and Lululemon Athletica Inc.[48] I have reviewed each selected guideline public company, and it appears that these companies are not in the same industry as each other, let alone in the same industry as EFD. Garmin is classified as a navigation systems company, Apple is classified as a technological entity, NIKE is classified as a footwear company, and Lululemon is an apparel and luxury goods company. While each of these companies has an aspect of their business that is similar to EFD, it is clear that the inappropriately selected companies are vastly different from each other and from EFD. More importantly, each of these is a publicly traded company, with a long track history, established worldwide market and reputation, that is well capitalized, and is diversified in the products that they sell.

In the computation of his WACC for the projection period, Mr. Hakala applies a 6.00% unsystematic, or company specific, risk premium without any explanation as to what factors he considered in coming up with 6%.[49] He also computes a WACC for the residual period, applying a 4.00% unsystematic risk premium.[50] There is no explanation of why the residual period has a smaller unsystematic risk premium than the projection period, nor why two separate WACC calculations were needed.

---

[45] On a consolidated basis, Mr. Hakala projected a total of $661,740 in operating expenses, or 39.1% of revenue ($661,740 / $1,692,394). See Hakala Report, Schedule B.2-2, 31-Dec-22 column.
[46] Hakala Report, para. 13.g. This estimate for fixed annual app maintenance is not broken out as a separate component of operating expenses.
[47] Valuing a Business, pgs. 187-191.
[48] Mr. Hakala's report mentions an additional company, VF Corporation, but it does not appear that company with included in his WACC calculation. VF Corporation is a conglomerate of brands, including The North Face, Vans, Dickies, and Timberland. VF Corporation would have been another inappropriate public company to consider in addition to his incorrectly chosen four. Expert Report of Scott D. Hakala, Ph.D ("Hakala Report") para. 10.
[49] Hakala Report, schedule B.4.
[50] Hakala Report, schedule B.4 (2).

13

Expert Report of Sean Sarsfield

*Confidential*

### 4.   Failure to Analyze the Product and Market

Besides researching the "participation rate" for boxing and MMA in the United States, Mr. Hakala fails to perform any market research into wearables for these sports and evaluate the product himself.

Even before the proof-of-concept fight occurred in June 2021, no similar product has experienced meaningful success or anything similar in both boxing and MMA. An article from January 2021, reviews the various "punch trackers" on the market at the time.[51] The specific trackers discussed in the article are PunchLab, Fightcamp, Corner, Everlast PIQ, and StrikeTec. While the reviewer found these devices to be "somewhat cool" and could potentially be useful with some improvements, overall, they were not that informative, only useful for a specific purpose (heavy bags), inconvenient and "annoying to put on". Specifically, with regard to the StrikeTec device, the reviewer did not have much positive feedback. He became "frustrated as heck" due to the lack of availability on the iOS platform. StrikeTec provided the device along with a pre-loaded Android phone in order for the reviewer to perform his testing. He describes the tracker as bulky, annoying, and potentially painful. Due to the application needing updates, the reviewer was never able to actually test the StrikeTec product. While it appears an iOS app was later developed, its initial inaccessibility was a major deterrent to iPhone users, especially considering other products on the market that were available on iOS.  For example, Everlast, a major brand in the boxing industry, also developed a punch tracker with a French sports wearables start-up called PIQ in 2017.[52] The PIQ tracker was $200 less expensive than StrikeTec, was described as one of the most high-tech trackers, and yet still did not gain enough popularity to succeed despite having a prominent boxing company promoting it. As of March 26, 2021, prior to any negotiations between Bally's and EFD, PIQ announced to its users via email that its "adventure just ended".[53] Further, as of August 11, 2021, at the time of the negotiations between Bally's and EFD, the piq.com website was shuttered and the product eventually discontinued.[54]

Considering the punch tracker technology has been around since at least 2017, and the quality of phone applications has vastly improved, one would think a device similar to the StrikeTec would have succeeded in the market if there was a demand for such a product.  In regards to StrikeTec, it was my understanding that discussions occurred between Bally's representatives and Wes Elliott that technical improvements

---

[51] https://expertboxing.com/boxing-punch-trackers-review
[52] https://gadgetsandwearables.com/2017/01/09/piq-boxing/
[53] https://kiteforum.com/viewtopic.php?t=2409550
[54] BC000791,
https://www.reddit.com/r/fightgear/comments/k62tes/question_piq_boxing_no_longer_available_yet/?rdt=56000
and https://web.archive.org/web/20210811184538/https:/piq.com/

14

Expert Report of Sean Sarsfield

*Confidential*

needed to be implemented for the StrikeTec sensor.[55]  To my knowledge, those improvements were never made.

### 5.   Unreasonable Approach Use

Mr. Hakala creates three scenarios in his analysis.  The first is based on EFD continuing its business without any new deals occurring.  The second scenario is based on the assumption that the Bally's agreement would occur, and the final scenario is based on the EntroBox LLC deal assuming EFD  did not turn down the estimated $6 million consumer use agreement.[56]  It is inappropriate to consider EntroBox as a separate deal that had to be turned down given the exclusivity Bally's was requesting for two reasons: 1) there was no signed agreement at the time that EFD was approached by EntroBox for a potential partnership agreement; and 2) Bally's never requested exclusivity on the consumer side of the business, only the commercial.  EFD was never precluded from continuing to grow its business on the consumer side.  Also, by Wes Elliott's own admission in the October 21, 2021 phone call recording, EFD was in discussions with other parties for consumer deals.  No Bally's representative on that call told Mr. Elliott that he should not be engaging in those conversations.[57]

### 6.   EntroBox LLC Scenario

While there was never a confirmed, signed agreement in place, had the project gone forward, EFD was never precluded from making deals with other parties.  EFD claims in the Amended Complaint, "Soo Kim stated that Bally's would buy the commercial use and that EFD would keep the consumer use."[58]  Mr. Hakala incorrectly states in his report that EFD gave up a potential $6 million deal with EntroBox for a consumer marketing and retail use.[59]  I have seen no evidence that the contemplated Bally's agreement in any way precluded EFD from continuing its consumer sales side of the business.

Mr. Hakala's damage calculation erroneously assumes that a hypothetical contract between EFD Sports and EntroBox would have terms similar to the contemplated deal with Bally's.  Based on the draft agreement presented to me, EFD would receive payments via a three percent (3%) Gross Revenue Royalty from all retail StrikeTec Sensor Sales[60] and other defined methods.   Mr. Hakala appears to ignore these terms in the calculation of his damages and fails to establish a link between his projected damages and the contemplated contract.

---

[55] BC000790-791.  See also BC000986-989.
[56] Hakala Report, para. 8.a-c.
[57] October 21, 2021 – attorney meeting Adi, Dave, Sina, Wes.
[58] Amended Complaint, para. 3.17.
[59] Hakala Report, para. 5.c.
[60] Draft Partnership Agreement Between EntroBox LLC and StrikeTec Inc.

Expert Report of Sean Sarsfield

*Confidential*

# VIII. Affirmative Damage Analysis

As noted above, there was never a signed agreement at any point in negotiations between Bally's and EFD. I have listened to the recordings of the phone calls between Wes Elliott and members of the Bally's team on July 18, 2021, August 9, 2021, October 21, 2021, and November 14, 2021. It is evident during these calls that both parties came to the table in good faith but by November 2021, the parties could not agree on the terms of the agreement. It was at that point that Bally's gave notice that they would not be continuing the discussions for the potential project.[61]

Further, the negotiations between Bally's and EFD did not preclude EFD from pursuing other opportunities. My understanding is that Bally's communicated to EFD that they were having conversations with other companies regarding comparable products[62], there was no reason why EFD could not have done the same and the documents demonstrates he was having discussions with Entrobox regarding a consumer application and chose not to pursue it.[63]

Although I don't agree with Mr. Hakala's calculation methodology and underlying assumptions, there are no damages in Scenario 1 of the Hakala Report. I agree with the overall premise of this scenario that there are no damages based on the facts of this case.

# IX.   CONCLUSION

In conclusion, it is my opinion that:

1.  EFD has no damages in the matter as evidenced by the facts of the case and the calculation of their own expert in Scenario 1 of the Hakala Report.

2.  Mr. Hakala's projections in Scenarios 2 and 3 are speculative, rely on assumptions that are unsupported, don't align with the facts of the case and therefore, cannot be relied upon.

3.  Mr. Hakala failed to provide an opinion or provide any support for EFD Sports, LLC's alleged costs incurred to meet Bally's expectations on the usability and stability of their product.

---

[61] Recorded calls from July 18, 2021, August 9, 2021, October 21, 2021, and November 14, 2021 produced in this matter.
[62] Recorded call from July 18, 2021. See also the Complaint, para. 3.17.
[63] Partnership Agreement between EntroBox LLC and StrikeTec, Inc. draft as of June 7, 2021. Under this proposed agreement, EFD and EntroBox were looking to partner in both commercial and retail use. While the Bally's deal would have precluded the commercial use piece, EFD was still open to discussing the retail use with EntroBox.

Expert Report of Sean Sarsfield

*Confidential*

***

My analysis is based on the information available at the time of this report. I have assumed this information is accurate and statements are truthful. Should information be produced to suggest otherwise, or if additional relevant information becomes available, I reserve the right to update my report accordingly.


_____          02-10-2025
Sean Sarsfield                                      Date
_____

17