UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| EFD SPORTS, LLC | § § | |
| v. | § § | |
| BALLY'S CORPORATION, SINA MIRI, SAM MIRI, AND ADI DHANDHANIA, INDIVIDUALLY. | § § § § § § § § | CIVIL NO. 4:24-CV-87-SDJ |
| Defendants. | § § § | |

# DECLARATION OF SCOTT D. HAKALA, PH.D., CFA IN RESPONSE TO *DEFENDANT BALLY'S CORPORATION'S MOTION TO EXCLUDE THE EXPERT REPORT, TESTIMONY, AND OPINIONS OF SCOTT HAKALA*

1. I was engaged by the Plaintiff, EFD Sports, LLC (the "Company" or "EFD Sports") to review the financial and other information produced to date to calculate damages resulting from the alleged breach of contract in which Bally's Corporation (the "Defendant" or "Bally's") failed to pay outstanding invoices to the Plaintiff, prematurely terminated the contract despite accepting the work performed, and contributed to additional loss of income by causing the Plaintiff to forego other professional opportunities. I have already issued an expert report on November 15, 2024, providing my testimony and opinions on this matter. I incorporate by reference that expert report.

2. I have now reviewed the Expert Report of Sean Sarsfield ("Sarsfield Report") dated February 10, 2025, as well as *Defendant Bally's Corporation's Motion to Exclude the Expert*

*Report, Testimony, and Opinions of Scott Hakala* ("Defendant's Motion to Exclude") dated February 17, 2025.

3.  My deposition was not taken in this matter. Had it been taken and had Defendant's counsel asked questions about the assumptions and methodology in my report, it would have been apparent that each step and aspect of the analysis performed was substantive, conservative, and based on actual data. Moreover, the methods employed are academically supported and recommended in authoritative texts, including Damodaran, *Damodaran on Valuation*, Second Edition, 2006; Smith, Smith, & Bliss, *Entrepreneurial Finance: Strategy, Valuation, & Deal Structure*, 2011, specifically Chapter 6: *Methods of Financial Forecasting: Revenue*, Chapter 7: *Methods of Financial Forecasting: Integrated Financial Modeling*, and Chapter 9: *Discounted Cash Flow Valuation* (Section 9.4) and *Matching Cash Flows and Discount Rates* (Section 9.10); and Goedhardt and Wessels, *Valuation: Measuring and Managing the Value of Companies*, Fourth Edition, 2005. I produced a substantial amount of research and documentation that is omitted, misrepresented, or ignored in both Defendant's Motion and in the Sarsfield Report. Similarly, the methods I employed and how I determined my analyses are often omitted from mention or misrepresented in both Defendant's Motion and in the Sarsfield Report.

4.  It should also be noted that Mr. Sarsfield is a forensic accountant and not a valuation expert. He did not conduct independent research or analysis and appears unfamiliar with valuation methods used to reasonably assess the value of an existing business with a product that is still in a relative early stage of operation.

5.  By contrast, I hold a Ph.D. and have over 32 years of experience valuing such businesses for various non-litigation purposes, including financing, financial reporting, and transaction and advisory purposes. I have taught courses on valuation and published peer-reviewed papers and

texts on the subject. Every step and procedure I employed was supported by research and experience and was applied conservatively. Where there was a question within a range of possible outcomes, I erred on the low end to properly reflect the balance of risks.

6.  Certain legal and factual elements argued in Defendant's Motion and the Sarsfield Report fall within the purview of the finder of fact and the Court, rather than my analysis. Unlike the Sarsfield Report, I have not directly addressed these issues. While I understand that these assertions of fact—regarding the nature of the negotiations, amounts owed to the Plaintiff, claims made by the Plaintiff, and certain other facts—are in dispute and erroneously presented in both Defendant's Motion and the Sarsfield Report, my role as an expert is to provide calculations and valuation guidance based on certain assumptions, as well as my research and understanding.

## MAJOR POINTS

7.  **I.**   The methods I employed are generally accepted in the peer-reviewed academic community and widely used to value businesses such as the business of the Plaintiff at the point in time when the claims arose.

8.  **II.**  The subject business did exist and did have revenues. There is a demand for this product in the marketplace. That is different from a "new business rule" type of business.

9.  **III.** The projections for sales, costs, and expenses were based on actual surveys and data that experts use and are appropriate for this business. They were adjusted and explicitly took into account the state of Plaintiff's business at the time.

10. **IV.**  Contrary to any assertions made, I did not make any substantive errors in the calculations of damages. I applied methods and data appropriately and conservatively, in line with recommended practice.

11. **V.** Assertions are not expert opinions or dispositive.

a. Contrary to the assertions in the Defendant's Motion, I did not assume that the subject business would reach the size or produce the revenues of "well-established international companies with diversified product lines and dominant positions in their industries." I did not base my projections for the subject business on public companies such as "Nike, Lululemon, or Peloton", as falsely asserted. The product was intended for a niche group within the mixed martial arts, boxing, and martial arts community, with a different price point and penetration rate. The revenues projected were a small fraction of what a larger, well-established company with a dominant position would anticipate.

b. Contrary to the assertions in the Defendant's Motion, the Plaintiff did have a workable product and revenues and was able to demonstrate that product. While costs for refinements, further development, and application software were accounted for in our analysis, these are expected as revenues are realized and the revenue base expands.

c. Claiming that damages are speculative in a legal sense does not make them so. Ignoring the facts and data relied upon does not provide a justification for asserting that facts and data do not exist when they did in this instance.

**FURTHER DISCUSSION**

**ESTABLISHED PUBLIC COMPANIES WERE NOT USED FOR REVENUE PROJECTIONS.**

12. Established public companies in similar and relevant markets were used solely as a basis for determining the systematic risk portion of the discount rate calculation in my analysis. The Defendant's Motion confuses this and misleads the court by suggesting that these companies were used to project the revenues, costs, and expenses of the Plaintiff's business. That is false.

13. We do not justify sales projections by comparing EFD to the comparison companies (Garmin, Apple, Nike, and Lululemon Athletica). These companies were used for two things within the model:

   a. The weighted average cost of capital ("WACC") calculation – These companies are similar in nature to EFD's product and all offer wearable technology that allows users to track fitness performance. It is common in calculating the cost of capital and cost of equity to consider companies that are publicly traded in order to adjust the equity risk premium for smaller, private companies. To adjust for the smaller size and greater risk, I also include a size premium in the WACC and an unsystematic risk premium of 6%, both based on industry estimates and direct experience when applied to relatively conservative projections.

   b. I also considered capital expenditure projections as a percentage of revenue since the companies are similar in nature. This will tend to overstate the amount of capital expenditures for a device similar to StrikeTec. Specific costs for development and maintenance of the software application component were based on the costs for that type of application (which Plaintiff had already developed to a certain point previously and had quotes for as well as documented research and experience).

**THE ENTROBOX REVENUE MODEL WAS CONSERVATIVE (built up based on actual studies and data for early-stage adoptions and then reduced for potential competition and niche interest to be conservative).**

14. The revenue model starts with the size of the addressable market in a limited number of initial target countries. We used actual survey data from published studies from Statistica and other sources to determine the number of boxing participants in the United States from 2018 to 2023 and by intensity.



15. We had separate information on the number of participants involved in martial arts, not counting boxing, from 2010 to 2023.



16. We had similar reference data for participation rates for certain other developed countries that were identified and targeted by the Plaintiff and applied those lower participation rates (conservatively) to determine the total addressable market.

|  | 2021 | 2022 | 2023 | 2024E | 2025E | 2026E | 2027E |
|---|---|---|---|---|---|---|---|
| **Source - Statista** | | | | | | | |
| Number of individuals who box in the United States | 9,345,000 | 9,787,000 | 8,378,000 | 8,796,900 | 9,148,776 | 9,423,239 | 9,705,936 |
| Growth Rate | | 4.7% | -14.4% | 5.0% | 4.0% | 3.0% | 3.0% |
| Martial Arts | 6,190,000 | 6,360,000 | 6,600,000 | 6,666,000 | 6,732,660 | 6,799,987 | 6,867,986 |
| Growth Rate | | 2.7% | 3.8% | 1% | 1% | 1% | 1% |
|  | | | | | | | |
| Marketable Population in the US | 15,535,000 | 16,147,000 | 14,978,000 | 15,462,900 | 15,881,436 | 16,223,226 | 16,573,923 |
| United States Population | 336,997,624 | 338,289,857 | 339,996,563 | 341,814,420 | 343,641,997 | 345,479,345 | 347,326,516 |
| Growth Rate | | 0.38% | 0.50% | 0.53% | 0.53% | 0.53% | 0.53% |
| % of population that participates in AM | 4.6% | 4.8% | 4.4% | 4.5% | 4.6% | 4.7% | 4.8% |
|  | | | | | | | |
| Canadian Population | 38,155,012 | 38,454,327 | 38,781,291 | 39,111,035 | 39,443,583 | 39,778,958 | 40,117,185 |
| Growth Rate | | 0.78% | 0.85% | 0.85% | 0.85% | 0.85% | 0.85% |
| % of population that participates in AM | 2.3% | 2.4% | 2.2% | 2.3% | 2.3% | 2.3% | 2.4% |
| Addressable Market | 879,440 | 917,737 | 854,224 | 884,647 | 911,444 | 933,982 | 957,167 |
|  | | | | | | | |
| Luxembourg Population | 634,730 | 645,397 | 660,809 | 667,417 | 674,091 | 680,832 | 687,640 |
| Growth Rate | | 1.68% | 2.39% | 1.0% | 1.0% | 1.0% | 1.0% |
| % of population that participates in AM | 2.3% | 2.4% | 2.2% | 2.3% | 2.3% | 2.3% | 2.4% |
| Addressable Market | 14,630 | 15,403 | 14,555 | 15,096 | 15,577 | 15,985 | 16,407 |
|  | | | | | | | |
| Switzerland Population | 8,738,800 | 8,815,400 | 8,962,300 | 9,051,923 | 9,142,442 | 9,233,867 | 9,326,205 |
| Growth Rate | | 0.88% | 1.67% | 1.0% | 1.0% | 1.0% | 1.0% |
| % of population that participates in AM | 2.3% | 2.4% | 2.2% | 2.3% | 2.3% | 2.3% | 2.4% |
| Addressable Market | 201,422 | 210,385 | 197,410 | 204,744 | 211,259 | 216,805 | 222,517 |
|  | | | | | | | |
| Norway Population | 5,425,270 | 5,488,984 | 5,550,203 | 5,605,705 | 5,661,762 | 5,718,380 | 5,775,563 |
| Growth Rate | | 1.17% | 1.12% | 1.0% | 1.0% | 1.0% | 1.0% |
| % of population that participates in AM | 2.3% | 2.4% | 2.2% | 2.3% | 2.3% | 2.3% | 2.4% |
| Addressable Market | 125,048 | 130,998 | 122,253 | 126,795 | 130,829 | 134,264 | 137,801 |
|  | | | | | | | |
| Ireland Population | 5,011,500 | 5,149,139 | 5,273,300 | 5,326,033 | 5,379,293 | 5,433,086 | 5,487,417 |
| Growth Rate | | 2.75% | 2.41% | 1.0% | 1.0% | 1.0% | 1.0% |
| % of population that participates in AM | 2.3% | 2.4% | 2.2% | 2.3% | 2.3% | 2.3% | 2.4% |
| Addressable Market | 115,511 | 122,887 | 116,153 | 120,469 | 124,302 | 127,565 | 130,926 |
|  | | | | | | | |
| Denmark Population | 5,845,240 | 5,882,261 | 5,910,913 | 5,939,705 | 5,968,636 | 5,997,709 | 6,026,923 |
| Growth Rate | | 0.63% | 0.49% | 0.5% | 0.5% | 0.5% | 0.5% |
| % of population that participates in AM | 2.3% | 2.4% | 2.2% | 2.3% | 2.3% | 2.3% | 2.4% |
| Addressable Market | 134,728 | 140,384 | 130,198 | 134,349 | 137,920 | 140,822 | 143,798 |
|  | | | | | | | |
| Netherlands Population | 17,730,564 | 17,904,421 | 18,092,524 | 18,273,449 | 18,456,184 | 18,640,746 | 18,827,153 |
| Growth Rate | | 0.98% | 1.05% | 1.0% | 1.0% | 1.0% | 1.0% |
| % of population that participates in AM | 2.3% | 2.4% | 2.2% | 2.3% | 2.3% | 2.3% | 2.4% |
| Addressable Market | 408,674 | 427,300 | 398,518 | 413,324 | 426,477 | 437,672 | 449,202 |
|  | | | | | | | |
| Austria Population | 8,922,082 | 8,939,617 | 8,958,960 | 8,978,345 | 8,997,772 | 9,017,240 | 9,036,751 |
| Growth Rate | | 0.20% | 0.22% | 0.2% | 0.2% | 0.2% | 0.2% |
| % of population that participates in AM | 2.3% | 2.4% | 2.2% | 2.3% | 2.3% | 2.3% | 2.4% |
| Addressable Market | 205,646 | 213,350 | 197,336 | 203,080 | 207,916 | 211,718 | 215,610 |
|  | | | | | | | |
| Germany Population | 83,200,000 | 84,400,000 | 83,400,000 | 84,234,000 | 85,076,340 | 85,927,103 | 86,786,374 |
| Growth Rate | | 1.44% | -1.18% | 1.0% | 1.0% | 1.0% | 1.0% |
| % of population that participates in AM | 2.3% | 2.4% | 2.2% | 2.3% | 2.3% | 2.3% | 2.4% |
| Addressable Market | 1,917,687 | 2,014,259 | 1,837,026 | 1,905,276 | 1,965,904 | 2,017,508 | 2,070,661 |
|  | | | | | | | |
| Australia Population | 25,422,788 | 26,000,000 | 26,600,000 | 26,866,000 | 27,134,660 | 27,406,007 | 27,680,067 |
| Growth Rate | | 2.27% | 2.31% | 1.0% | 1.0% | 1.0% | 1.0% |
| % of population that participates in AM | 2.3% | 2.4% | 2.2% | 2.3% | 2.3% | 2.3% | 2.4% |
| Addressable Market | 585,973 | 620,506 | 585,910 | 607,678 | 627,015 | 643,474 | 660,427 |
|  | | | | | | | |
| **TAM** | **20,123,759** | **20,960,209** | **19,431,583** | **20,078,358** | **20,640,079** | **21,103,021** | **21,578,439** |

17. We then relied on actual experience and studies to conservatively estimate the percentage of the market that would purchase these types of devices or express interest based on market

studies of early stage penetration rates. Additionally, we analyzed the number and types of studios offering boxing, mixed martial arts, and martial arts, along with the likely interest and penetration rates. The data also included reports and studies on typical early-stage penetration rates within a market.

   a. **Diffusion of Innovations (Everett Rogers, 2003):** This book introduces the concept of market adoption curves, with innovators representing around 2.5% and early adopters at about 13.5%. This framework is often used to understand how new products enter markets.
   b. **The Bass Model** (Bass, 1969) provides a framework for forecasting the adoption of new products based on an initial low penetration that accelerates over time as word-of-mouth and media effects kick in. This model is widely used in academic and practical forecasting and supports the notion that new product adoption begins at modest rates, which our conservative estimates reflect.
   c. **Empirical Studies on New Product Adoption**: Research such as that by Tellis, Yin, and Krishnan (2006) in the Journal of Marketing shows that early penetration rates for new products—especially in innovative or niche sectors—are typically very low (often in the 1–3% range) before scaling up over time. This body of work supports the use of low initial penetration assumptions in revenue forecasting for startups and new product launches. See Tellis, G. J., Yin, E. Y., & Krishnan, R. (2006). "Global new product diffusion: A meta-analysis and research agenda." *Journal of Marketing*, 70(3), 56-68.

18.   To account for the niche market and ensure reasonable certainty, the unit penetration rates were set at extremely conservative levels, allowing for a manageable ramp-up of units. Initially, the penetration rate was set at just 0.01%, increasing gradually by 0.0125% per year, ultimately reaching only 0.2% of the potential market after factoring in possible competition and limited marketing. This approach is further supported by industry data, including Statista's report but far more conservative and below *"Penetration Rate of the Fitness/Activity Tracking Wristwear Market Worldwide from 2020 to 2029."* See the image below for reference.



Details: Worldwide; Statista Digital Market Insights; 2020 to 2029

19. The Plaintiff has actual sales and experience selling to a very small market already.

20. The product price of $299 was set based on experience and market demand.

**SUBSCRIPTION REVENUE WAS VERY CONSERVATIVE**.

21. Subscriptions to the application were also projected conservatively, set at lower levels than market data suggested and at the lower end of the range for similar devices.

   a. Only 50% of new hardware unit sales were assumed to result in new subscriptions, compared to the more typical rate of 90% or higher.
   b. Subscriptions are assumed to have an initial attrition rate of 20% and 10% thereafter which is greater than actual data for this device and other devices.
   c. The average "churn" rate from research is 7% to 10% per annum in the data produced.

See the schedule below for the Entrobox revenue calculation, which outlines the projected revenue based on conservative penetration rates, subscription adoption, and market assumptions.

| Strike Tec Sales | | Entrobox | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Hardware** | | | | | | | | |
| Price | | | | | Unit Capture | | | |
| $299.0 | | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | |
| Penetration Rate | Hardware Revenue | 0.010% | 0.023% | 0.035% | 0.048% | 0.060% | 0.174% | |
| 0.010% | Units Sold | 2,096 | 4,372 | 7,027 | 9,804 | 12,662 | 35,961 | |
| Growth Rate after Penetration | Hardware Revenue | $626,704 | $1,307,228 | $2,101,073 | $2,931,396 | $3,785,938 | $4,164,532 | $4,414,404 |
| 0.0125% | Growth Rater after initial period | | | | | | 10.0% | 6.0% |
| **Subscription** | | | | | | | | |
| Hardware to Subscription Conversion | | | | | | | | |
| 50% | Number of New Subscribers | 1,048 | 2,186 | 3,514 | 4,902 | 6,331 | | |
| Price Per Month | Churn Rate | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | | |
| $9.99 | New Subscribers Lost | 210 | 437 | 703 | 980 | 1,266 | | |
| Attrition Rate | Net New Subs EOY | 838 | 1,749 | 2,811 | 3,922 | 5,065 | | |
| 20% | Old Subscribers Lost | | 168 | 417 | 762 | 1,189 | | |
| | EOY Subscribers | 838 | 2,419 | 4,813 | 7,973 | 11,849 | | |
| 10% | Subscription Revenue | $50,230 | $195,225 | $433,486 | $766,393 | $1,188,131 | $1,306,944 | $1,385,360 |
| | Growth Rate after Initial Period | | | | | | 10.0% | 6.0% |
| | Total Revenue | $676,934 | $1,502,453 | $2,534,559 | $3,697,789 | $4,974,069 | $5,471,476 | $5,799,764 |

**BALLY'S SCENARIO REVENUE ESTIMATES WERE CONSERVATIVE.**

22. We recognized the Bally's use of the devices (under a separate agreement) would result in greater initial interest and penetration. The initial hardware penetration rate into the TAM is projected to be .025% in year 1 with the unit capture rate growing by .025% each year after that. This leads to a penetration rate of less than .4% throughout the projected period which is a conservative penetration rate projection.

23. Subscriptions to the application were also very conservative and less than market data suggested, at the lower end of the range for such devices, using the same assumptions as a percentage of new hardware sales as in the Entrobox scenario. Only a portion of the new hardware unit sales result in new subscriptions.

**RESPONDING MORE GENERALLY TO THE ASSERTIONS IN DEFENDANT'S MOTION**

24. **Market Analysis:** Contrary to claims of ignoring market potential, the buildout carefully derives its total addressable market from verified participation data, ensuring that projections are reflective of actual consumer behavior. It considers the limited marketing and testing of the

Plaintiff as well. See *"Number of Users of Fitness/Activity Wristwear Worldwide from 2020 to 2029"* below.



25.  **There are No Unsupported Assumptions**. The model does not assume immediate, world-wide market penetration or equate the performance of an unproven product to established international brands. Instead, it builds on modest, stepwise growth assumptions, thereby avoiding the pitfalls of overestimation and providing an, if anything, overly conservative expected projection.

26.  **There is No Double Counting.** The TAM does not double-count market participants as the boxing data from Statista very clearly states that it includes only fitness mixed martial arts participants. Fitness mixed martial arts differs greatly from traditional martial arts.

27.  **The report does not use a potential market consisting of every person who has participated in boxing or mixed martial arts.** Instead, the report defines the potential market

as participants from the following 11 countries: United States, Canada, Luxembourg, Switzerland, Norway, Ireland, Denmark, Netherlands, Austria, Germany, and Australia. This represents a small subset of the 195 countries worldwide, and the Company has already made sales to international clients. Additionally, the market considered consists specifically of individuals actively participating in boxing and martial arts.

28.     **The costs and expenses are specific to this product and its associated software application** and estimated to ensure room for error, understating actual margins relative to similar types of products. The Plaintiff had actual data and information for these costs and expenses, which we increased for scale and marketing based on actual reference data.

29.     **The cost of capital calculation is a rigorous and conceptually correct methodology**. I authored a chapter on this topic in the late 1990s[1] and have conducted extensive research on actual, realized, and expected returns for development-stage investments. This methodology is a textbook standard, as outlined in both graduate-level academic texts (e.g., Damodaran, *Damodaran on Valuation*, Second Edition, 2006; Smith, Smith, & Bliss, *Entrepreneurial Finance: Strategy, Valuation, & Deal Structure*, 2011, including Chapters 6 on Methods of Financial Forecasting: Revenue, Chapter 7 on Methods of Financial Forecasting: Integrated Financial Modeling, and Chapter 9 on Discounted Cash Flow Valuation and Matching Cash Flows and Discount Rates) and in practical valuation texts (e.g., Koller, Goedhardt, and Wessels, *Valuation: Measuring and Managing the Value of Companies*, Fourth Edition, 2005, along with earlier and later editions).

  i. We calculate the cost of equity using the Capital Asset Pricing Model, a cornerstone of corporate finance. This involves adding the risk-free rate to the product of the levered beta and the equity risk premium.

---

[1] Xx insert reference.

    ii. **Risk-Free Rate:** We source the risk-free rate from the 20-year U.S. Treasury yield as of the valuation date, ensuring that our baseline reflects current market conditions.

    iii. **Levered Beta Determination:** The levered beta is obtained by re-levering the unlevered beta of carefully selected comparable companies—Garmin Ltd, Apple Inc., NIKE, Inc., and Lululemon Athletica Inc.—which share key characteristics with EFD's business. The re-levering uses the target debt/equity ratio (median of our comparable companies) and the standard formula: Unlevered Beta × [1 + (Target Debt/Equity Ratio × (1 – Effective Tax Rate))].

    iv. **Equity Risk Premium:** We pull the equity risk premium from the Kroll Cost of Capital Navigator, reflecting a long-term, supply-side perspective as of the valuation date.

    v. This methodology yields a cost of equity of 20.3%, a figure that accurately reflects market risks and the specifics of the comparable companies used.

    vi. **Cost of Debt Calculation:** Our cost of debt is derived by considering the debt/capital ratio—computed as 1 minus [1/(1 + pre-tax cost of debt)]—and then applying an after-tax adjustment (Pre-tax cost of debt × (1 – Effective Tax Rate)). This approach is in line with industry standards and leverages Moody's Baa-rated corporate bond plus a private cost to ensure reliability.

## SUMMARY

30. In summary, the methods I employed are generally accepted and recommended in widely regarded academic literature and used outside of litigation. I have extensive experience applying these methods in practice. I relied upon and considered data and studies that are reasonable and relevant and was very conservative where there may be a range of possible outcomes. Furthermore, the methodology aligns with the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, as it is based on reliable principles and methods that have been tested, peer-reviewed, and widely accepted in the field of valuation and financial analysis. The approach is supported by established academic research, industry practice, and real-world applications

beyond the litigation context. Additionally, my analysis follows a rigorous and systematic process, ensuring that the conclusions are grounded in factual data rather than speculation. The transparency of assumptions, reliance on empirical studies, and conservative estimates further demonstrate the reliability and relevance of my findings under *Daubert* criteria.

## JURAT

My name is Scott David Hakala, and my date of birth is June 6, 1961. My business address is 950 E. State Highway 114, Suite 120, Southlake, Texas 76092. My home address is 2635 Bierstadt Drive, Highland Village, Texas 75077.

I declare under penalty of perjury under the laws of the United States and the State of Texas that the foregoing is true and correct.

Executed in Tarrant County, Texas on March 3, 2024.

*[signature]*

Scott D. Hakala