# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| **EFD SPORTS, LLC** | § | |
| | § | |
| **v.** | § | **CIVIL NO. 4:24-CV-87-SDJ** |
| | § | |
| **BALLY'S CORPORATION** | § | |
| | § | |

### PLAINTIFF'S RESPONSE TO MOTION TO EXCLUDE THE EXPERT REPORT, TESTIMONY, AN OPINIONS OF SCOTT D. HAKALA, PH.D, CFA

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, Plaintiff in the above entitled and numbered cause of action and files its Response to Defendant's Motion To Exclude the Expert Report, Testimony, and Opinions of Scott D. Hakala, PH.D, CFA.

Respectfully submitted,

*/s/Donald M. Kaiser Jr.*
Donald M. Kaiser Jr.
Texas State Bar No. 24025466
dkaiser@attorneysforbusiness.com

**KAISER LEGAL SOLUTIONS, PLLC**
5440 Harvest Hill Road
Suite 201
Dallas, Texas 75203
(214) 441-3000
(214) 441-3001 (fax)

**COUNSEL FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

This is to certify that, on March 3, 2025, a true and correct copy of this document has been served on counsel of record in accordance with the Federal Rules of Civil Procedure.

*/s/Donald M. Kaiser Jr.*
Donald M. Kaiser Jr.

# TABLE OF CONTENTS

Table of Authorities……………………………………………………………    4

I. Summary of Argument……………………………………………………    7

II. Legal Standard……………………………………………………………    8

III.  Response to Motion to Exclude……………………………………………    11

      Qualifications of Hakala……………………………………………..    11

      Opinion is Relevant to Damages…………………………………….    12

      Reliability and Methodology- Tested Theory or Technique………………...    17

      Reliability and Methodology- Known or potential rate of error……………    21

      Reliability and Methodology- Subject to peer review/accepted
      by scientific community……………………………………………..    22

      Rule of Evidence 403………………………………………………..    22

      Conclusion…………………………………………………………..    23

## <u>TABLE OF AUTHORITIES</u>

### <u>Federal Cases</u>

### Supreme Court

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579, 592-98, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)…………………..    9, 10

*Kumho Tire Co. v. Carmichael,*
526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)………………………    9, 10, 11

### 5th Circuit Court of Appeals

*Amigo Broad., LP v. Spanish Broad. Sys.,*
521 F.3d 472, 482-483 (5th Cir. 2008)…………………………………………...    13

*Blase Indus. Corp. v. Anorad Corp.,*
442 F.3d 235, 238 (5th Cir. 2006)………………………………………………    12, 13, 14

*Dearmond v. Wal—Mart La. LLC,*
335 F. App'x 442, 444 (5th Cir. 2009)…………………………………………..    10

*Guy v. Crown Equip. Corp.,*
394 F.3d 320, 325 (5th Cir. 2004)………………………………………………    9

*Moore v. Ashland Chem. Inc.,*
151 F.3d 269, 276 (5th Cir. 1998)………………………………………………    10

*Pipitone v. Biomatrix, Inc.,*
288 F.3d 239, 244 (5th Cir. 2002)………………………………………………    9

*Roman v. W. Mfg., Inc.,*
691 F.3d 686, 692 (5th Cir. 2012) ………………………………………………    11

*Sandifer v. Hoyt Archery, Inc.,*
907 F.3d 802, 807 (5th Cir. 2018). ……………………………………………..    9

*SEC v. Life Partners Holdings, Inc.,*
854 F.3d 765, 775 n.4 (5th Cir. 2017)…………………………………………...    10

*St. Martin v. Mobil Expl. & Producing U.S. Inc.,*
224 F.3d 402, 405 (5th Cir. 2000)………………………………………………    11

*Taylor Pipeline Const., Inc. v. Directional Rd. Boring, Inc.,*
438 F. Supp. 2d 696, 705 (E.D. Tex. 2006)……………………………………………    9, 10

*Watkins v. Telsmith, Inc.,*
121 F.3d 984, 991 (5th Cir. 1997)……………………………………………………    10

*Wilson v. Woods,*
163 F.3d 935, 937 (5th Cir. 1999))……………………………………………………    9

*United States v. 14.38 Acres of Land*,
80 F.3d 1074, 1078 (5th Cir. 1996)…………………………………………………...    10

*United States v. Norris*,
217 F.3d 262, 269 (5th Cir. 2000)……………………………………………………    11

*United States v. Valencia*,
600 F.3d 389, 424 (5th Cir. 2010)……………………………………………………    11

**Federal District Court**

*Balfour Beatty Rail, Inc. v. Kan. City S. Ry. Co.,* …………………………………    9
173 F. Supp. 3d 363, 408 (N.D. Tex. 2016)

*Gen. Star Indem. Co. v. Sherry Brooke Revocable Tr.,*
243 F. Supp. 2d 605, 623 (W.D. Tex. 2001)…………………………………………    8

*Hall Arts Ctr. Office, LLC v. Hanover Ins. Co.,*
327 F. Supp. 3d 979, 1001 (N.D. Tex. 2018)………………………………………..    9

*Kumar v. Frisco Indep. Sch. Dist.,* No. 4:19-CV-00284,
476 F. Supp. 3d 439, 2020 U.S. Dist. LEXIS 138141,
2020 WL 4464502, at *19 (E.D. Tex. Aug. 4, 2020)………………………………...    11

*Little v. Tech. Specialty Prods., LLC*,
940 F. Supp. 2d 460, 467 (E.D. Tex. 2013).,………………………………………...    9

*McGowan & Co. v. Bogan*,
93 F. Supp. 3d 624, 2015 U.S. Dist. LEXIS 32245 (S.D. Tex., Mar. 17, 2015)………    13

*Mobility Workx, LLC v. Cellco P'ship*,
No. 4:17-CV-00872, 2019 U.S. Dist. LEXIS 191345,
2019 WL 5721814, at *3 (E.D. Tex. Nov. 5, 2019) …………………………………    11

*Swanston v. City of Plano Tex.*,
2021 U.S. Dist. LEXIS 18204, 2021 WL 327588, at *2 (E.D. Tex. Feb. 1, 2021)…..    7, 11

**Texas State Court**

*Arthur Andersen & Co v. Perry Equip. Corp.*,
945 S.W.2d 812, 816, 40 Tex. Sup. Ct. J. 591 (Tex. 1997)……………………………    13

*Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*,
960 S.W.2d 41, 49 (Tex. 1998)……………………………………………………….    13

*Glattly v. Air Starter Components, Inc.*,
332 S.W.3d 620, 629 (Tex. App.—Houston [1st Dist.] 2010, pet. denied))…………    13

*Interceramic, Inc. v. S. Orient R.R. Co.*,
999 S.W.2d 920, 928 (Tex. App. 1999). ……………………………………………    12

*Szczepanik v. First S. Trust Co.*,
883 S.W.2d 648, 649 (Tex. 1994) (per curiam)……………………………………    12, 13

## <u>Federal Rules of Evidence</u>

FEDERAL RULE OF EVIDENCE 403……………………………………………    8, 22

FEDERAL RULE OF EVIDENCE 702……………………………………………    11

# I.  SUMMARY OF ARGUMENT

1.1     Defendant's Motion fails to attach the complete Expert Report of Scott D. Hakala in that Defendant failed to include the Exhibits and Schedules, including the financial statements created by the analysis completed by Hakala and Hakala's Vitae documenting Hakala's robust qualifications and credentials. The Export Report of Scott D. Hakala is attached hereto as Exhibit A and incorporated by reference in all sections as if reprinted herein verbatim (Doc 35).

1.2     Currently, this case is set for a bench trial.  This District has recognized that the Daubert standards are largely irrelevant to bench trials for the following reasons:

- The Daubert standard is primarily intended to protect juries from unreliable expert testimony.

- In a bench trial, the judge is presumed to understand the limited purpose of expert testimony and not rely on it improperly

- Vigorous cross-examination and presentation of contrary evidence are sufficient to address potentially questionable expert testimony in a bench trial.

- The safeguards provided by Daubert are largely irrelevant when there is no jury to be influenced by potentially unreliable evidence.

*Swanston v. City of Plano Tex.*, 2021 U.S. Dist. LEXIS 18204, 2021 WL 327588, at *2 (E.D. Tex. Feb. 1, 2021).

1.3     Scott D. Hakala's Expert Report is relevant to the issue of damages in this case.

1.4     Scott D. Hakala's Expert Report is reliable.  Attached hereto and incorporated by reference as if reprinted verbatim in all sections herein is the Declaration of Scott Hakala in Response to Defendant's Motion.[1] See Exhibit B- Declaration of Scott D. Hakala ("Hakala Dec").

---

[1] As of the date of this Response, neither Dr.Hakala nor Mr. Sarfield have been deposed.  The deadline for Plaintiff's objection to Mr. Sarfield's Export report is March 17, 2025.

1.5     The Declaration supports the substantial support, methodologies, analysis and principles, that are recognized and peer reviewed, used by Hakala to create the report and support the opinion of Dr.Hakala.  The report is reliable in its methodology, the factual basis of the opinion, and the connection between the facts and the conclusion.  Exhibit B, Page 3.

1.6     On page 13 of the Motion, in its argument for exclusion under Federal Rule of Evidence 403, Plaintiff admits that Hakala is presented on the element of damages (relevant to this case), and fears his credentials may be perceived as authoritative.[2]  The probative value of Dr.Hakala's opinion goes directly to the element of damages for Plaintiff's claims.  Dr.Hakala does not provide any opinion as to liability elements.  The probative value of Hakala's expert opinion substantially outweighs any unfair prejudice to Defendant.  Other than stating that Hakala's credentials may be too good, the Defendant's Motion fails to describe how Hakala's opinion on damages causes unfair prejudice and could "confuse the jury".  About what?, the argument by Defendant is nothing more than a naked assertion and regardless this case is currently set as a bench trial. Defendant has designated an expert to rebut Dr.Hakala (although still subject to objection), and presumably can present a counter argument on damages or cross-examine Expert Hakala (who has yet to be depose).  Thus far, Sarsfield's counter-argument is zero damages, given liability is found.  The Judge can determine the applicability of the opinions to the case as there is no jury to confuse.

## II.  LEGAL STANDARD

2.1     The Federal Rules of Evidence permit the use of expert testimony when such testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Gen. Star Indem. Co. v. Sherry Brooke Revocable Tr.,* 243 F. Supp. 2d 605, 623 (W.D. Tex.

---

[2]  Defendant's Motion does not include any substantive challenge or argument that Scott Hakala is not qualified to provide his expert opinion in this case.

2001) (citing FED. R. EVID. 702). But "prior to admitting expert testimony, 'district courts must be assured that the proffered witness is qualified to testify by virtue of his knowledge, skill, experience, training, or education.'" *Taylor Pipeline Const., Inc. v. Directional Rd. Boring, Inc.,* 438 F. Supp. 2d 696, 705 (E.D. Tex. 2006) (cleaned up) (quoting *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)); see *Balfour Beatty Rail, Inc. v. Kan. City S. Ry. Co.,* 173 F. Supp. 3d 363, 408 (N.D. Tex. 2016) ("District courts are assigned a gatekeeping role to determine the admissibility of expert testimony." (citing *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 592-98, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993))). Courts act as gatekeepers "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).

2.2     Courts review the admissibility of expert opinions under the framework the Supreme Court set out in Daubert. *Sandifer v. Hoyt Archery, Inc.,* 907 F.3d 802, 807 (5th Cir. 2018). The party offering an expert's testimony must prove "(1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable." *Hall Arts Ctr. Office, LLC v. Hanover Ins. Co.,* 327 F. Supp. 3d 979, 1001 (N.D. Tex. 2018) (citing Kumho, 526 U.S. at 147). "A proffered expert witness is qualified to testify by virtue of his or her 'knowledge, [*3]  skill, experience, training, or education.'" *Little v. Tech. Specialty Prods., LLC*, 940 F. Supp. 2d 460, 467 (E.D. Tex. 2013) (quoting FED. R. EVID. 702). "[E]xpert testimony is admissible only if it is both relevant and reliable." *Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 244 (5th Cir. 2002); see *Guy v. Crown Equip. Corp.,* 394 F.3d 320, 325 (5th Cir. 2004) ("It goes without saying that Daubert clarified a district court's gate-keeping function: the court must ensure the expert uses

reliable methods to reach his opinions; and those opinions must be relevant to the facts of the case."). "This gate-keeping obligation applies to all types of expert testimony, not just scientific testimony." *Kumho*, 526 U.S. at 147.

2.3     Critically, the party offering expert testimony "must prove by a preponderance of the evidence that the testimony is reliable," not that it is correct. *Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 276 (5th Cir. 1998). The role of district courts at this juncture is to ensure relevance and reliability, not accuracy. See *Watkins v. Telsmith, Inc.,* 121 F.3d 984, 991 (5th Cir. 1997) (explaining the district courts' role under Daubert is deciding "whether the expert is a hired gun or a person whose opinion in the courtroom will withstand the same scrutiny that it would among his professional peers"). It is imperative for district courts to bear in mind that the Daubert regime does not enlist judges "as a replacement for the adversary system." *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996); see *Dearmond v. Wal—Mart La. LLC*, 335 F. App'x 442, 444 (5th Cir. 2009) ("Cross-examination at trial . . . is the proper forum for discrediting testimony, and credibility determinations are, of course, the province of the jury.").

2.4     Courts consider the factors put forward by the Daubert Court to help assess the reliability of expert testimony:

(1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community. *SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 775 n.4 (5th Cir. 2017) (citing *Pipitone*, 288 F.3d at 244). "When evaluating Daubert challenges, courts focus 'on the experts' principles and

methodology, not on the conclusions that the experts generate.'" *Mobility Workx, LLC v. Cellco P'ship*, No. 4:17-CV-00872, 2019 U.S. Dist. LEXIS 191345, 2019 WL 5721814, at *3 (E.D. Tex. Nov. 5, 2019) (brackets omitted) (quoting Daubert, 509 U.S. at 595).

2.5    The Daubert factors are "non-exclusive and 'do not constitute a definitive checklist or test.'" *United States v. Norris*, 217 F.3d 262, 269 (5th Cir. 2000) (quoting Kumho, 526 U.S. at 150). This inquiry is a "flexible one," allowing district courts "to identify the most germane considerations." *Roman v. W. Mfg., Inc.,* 691 F.3d 686, 692 (5th Cir. 2012) (citing *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010)); see *Kumar v. Frisco Indep. Sch. Dist.,* No. 4:19-CV-00284, 476 F. Supp. 3d 439, 2020 U.S. Dist. LEXIS 138141, 2020 WL 4464502, at *19 (E.D. Tex. Aug. 4, 2020) ("The test for determining reliability can adapt to the particular circumstances underlying the testimony at issue." (citing *Kumho*, 526 U.S. at 152)). Nevertheless, "caselaw after Daubert shows that the rejection of expert testimony is the exception rather than the rule." FED. R. EVID. 702 advisory committee's note to 2000 amendment. Whether to allow or exclude expert testimony is committed to the sound discretion of district courts, *St. Martin v. Mobil Expl. & Producing U.S. Inc.,* 224 F.3d 402, 405 (5th Cir. 2000). **SEE** *Swanston v. City of Plano Tex.*, 2021 U.S. Dist. LEXIS 18204, 2021 WL 327588, at *2 (E.D. Tex. Feb. 1, 2021).

## III. RESPONSE TO MOTION TO EXCLUDE

### Qualifications of Hakala

3.1    The extensive qualifications of Scott D. Hakala, PHD CFA are contained in his report. *See* Exhibit A (Doc 35), Page 16. There is no substantive argument in Defendant's Motion challenging the qualifications of Hakala.

3.2    Scott D. Hakala holds a Ph.D. and has over 32 years of experience valuing such businesses for various non-litigation purposes, including financing, financial reporting, and transaction and advisory purposes. Dr.Hakala has taught courses on valuation and published peer-reviewed papers and texts on the subject.  Exhibit B, Page 2, Para 5.

**Opinion is Relevant to Damages.**

3.3    The live Petition in this case is the Second Amended Petition.  Plaintiff has moved for leave to file its Third Amended Petition, the parties have briefed the issue, and are awaiting the Court's ruling on same.

3.4    Relevant to Defendant's Motion, Plaintiff claims as follows:

1.  Breach of Contract

2.  Fraud/Fraud in the Inducement

3.  Tortious Interference with Contract/Prospective Relations (Third Amended)

3.5    Ordinarily, when a court concludes that there has been a breach of contract, it enforces the broken promise by protecting the expectation that the injured party had when he made the contract." Restatement (Second) of Contracts § 344 cmt. a.

3.6    "A proper measure of damages in a breach of contract case is the loss of contractual profit." *Interceramic, Inc. v. S. Orient R.R. Co.,* 999 S.W.2d 920, 928 (Tex. App. 1999). The ability to recover lost profits "does not require that the loss be susceptible to exact calculation." *Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex. 1994) (per curiam). The injured party must, however, establish the amount of the loss "by competent evidence with reasonable certainty." Id. Quite simply, lost profit damages "may not be based on evidence that is speculative, uncertain, contingent, or hypothetical." *Blase Indus. Corp. v. Anorad Corp.,* 442 F.3d 235, 238 (5th Cir. 2006). "At a minimum, opinions or estimates of lost profits must be

based on objective facts, figures, or data from which the amount of lost profits may be ascertained." *Szczepanik*, 883 S.W.2d at 649. However, "[w]hile some uncertainty as to the amount of damages is permissible, uncertainty as to the fact of damages will defeat recovery." *Blase Indus. Corp.,* 442 F.3d at 238 (emphasis added) *Amigo Broad., LP v. Spanish Broad. Sys.,* 521 F.3d 472, 482-483.

3.7    Lost profits may be recovered as fraud damages either as direct damages or consequential damages. Direct damages are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong. *Arthur Andersen & Co v. Perry Equip. Corp*., 945 S.W.2d 812, 816, 40 Tex. Sup. Ct. J. 591 (Tex. 1997).  In the proper case, consequential damages could include foreseeable profits from other business opportunities lost as a result of the fraudulent misrepresentation" or nondisclosure.  *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 49 (Tex. 1998).

3.8    Lost profits are available as damages under Texas law for tortious interference with prospective business relationships. See M&O, at 48, n.51 (citing *Glattly v. Air Starter Components, Inc.,* 332 S.W.3d 620, 629 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)).

3.9    The ability to recover lost profits "does not require that the loss be susceptible to exact calculation." *Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex. 1994) (per curiam). The injured party must, however, establish the amount of the loss "by competent evidence with reasonable certainty." Id. Quite simply, lost profit damages "may not be based on evidence that is speculative, uncertain, contingent, or hypothetical." *Blase Indus. Corp. v. Anorad Corp.,* 442 F.3d 235, 238 (5th Cir. 2006). "At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained." *Szczepanik*, 883 S.W.2d at 649. However, "[w]hile some uncertainty as to

the amount of damages is permissible, uncertainty as to the fact of damages will defeat recovery." *Blase Indus. Corp.,* 442 F.3d at 238 (emphasis added) *Amigo Broad., LP v. Spanish Broad. Sys.,* 521 F.3d 472, 482-483.

      3.10    Hakala's report presents three scenarios to create appropriate financial forecasts for the Fair Value of EFD that reflect revenues, expenses, income, and equity through 2033, as calculated from the date of the breach.  The scenarios are:

        a.  EFD Sports, LLC with no Contract (Exhibit A, Page 6, Para 12)

        b.  EFD Sports, LLC as contracted with Ballys (Exhibit A, Page 7, Para 13)

        c.  EFD Sports, LLC as contracted with Entrobox (Exhibit A, Page 10, Para 14)

Exhibit A, Page 3, Para 8.

      3.11    The three scenarios contain a financial model using an income approach method called the discounted cash flow method (DCF) to reflect the value and profitability of EFD had the contract been performed by Ballys (Contract and Fraud damages) and had Ballys not interfered as claimed and the contract with Entrobox would have been performed (Tortious Interference damages).  Exhibit A, Page 4, Para 9.  The damage model provides extrapolated income statements in each scenario based on recognized methodologies and principles, including risk and discounting, as described in Hakala's declaration and the report itself.  *See* Exhibits A and B.  The model and damages set forth therein are directly relevant to the claims at issue.

      3.12    Defendant's Motion and more specifically the Sarsfield report contains false assertions.  The following conclusively disproves Sarfield's false assertions rendering the Motion and opinion based on them meaningless:

   **a.  Market Analysis:** Contrary to claims of ignoring market potential, the buildout carefully derives its total addressable market from verified participation data, ensuring that

projections are reflective of actual consumer behavior. It considers the limited marketing

and testing of the Plaintiff as well. See *"Number of Users of Fitness/Activity Wristwear*

*Worldwide from 2020 to 2029"*.  Exhibit B, Page 10, Para 24.

b.  **There are No Unsupported Assumptions**: The model does not assume immediate,

world-wide market penetration or equate the performance of an unproven product to

established international brands. Instead, it builds on modest, stepwise growth

assumptions, thereby avoiding the pitfalls of overestimation and providing an, if

anything, overly conservative expected projection.  Exhibit B, Page 11, Para 25.

c.  **There is No Double Counting:** The TAM does not double-count market participants as

the boxing data from Statista very clearly states that it includes only fitness mixed martial

arts participants. Fitness mixed martial arts differs greatly from traditional martial arts.

Exhibit B, Page 11, Para 26.

d.  **The report does not use a potential market consisting of every person who has**

**participated in boxing or mixed martial arts or martial arts.** Instead, the report

defines the potential market as participants from the following 11 countries: United

States, Canada, Luxembourg, Switzerland, Norway, Ireland, Denmark, Netherlands,

Austria, Germany, and Australia. This represents a small subset of the 195 countries

worldwide, and the Company has already made sales to international clients.

Additionally, the market considered consists specifically of individuals actively

participating in boxing and martial arts.  Exhibit B, Page 11, Para 27.

e.  **The costs and expenses are specific to this product and its associated software**

**application** and estimated to ensure room for error, understating actual margins relative

to similar types of products. The Plaintiff had actual data and information for these costs

and expenses, which we increased for scale and marketing based on actual reference days. Exhibit B, Page 12, Para 28

f. **The cost of capital calculation is a rigorous and conceptually correct methodology**. Expert Hakala authored a chapter on this topic in the late 1990s[3] and conducted extensive research on actual, realized, and expected returns for development-stage investments. This methodology is a textbook standard, as outlined in both graduate-level academic texts (e.g., Damodaran, *Damodaran on Valuation*, Second Edition, 2006; Smith, Smith, & Bliss, *Entrepreneurial Finance: Strategy, Valuation, & Deal Structure*, 2011, including Chapters 6 on Methods of Financial Forecasting: Revenue, Chapter 7 on Methods of Financial Forecasting: Integrated Financial Modeling, and Chapter 9 on Discounted Cash Flow Valuation and Matching Cash Flows and Discount Rates) and in practical valuation texts (e.g., Koller, Goedhardt, and Wessels, *Valuation: Measuring and Managing the Value of Companies*, Fourth Edition, 2005, along with earlier and later editions).

   i. We[Hakala? calculated the cost of equity using the Capital Asset Pricing Model, a cornerstone of corporate finance. This involves adding the risk-free rate to the product of the levered beta and the equity risk premium.

   ii. **Risk-Free Rate:** Hakala sourced the risk-free rate from the 20-year U.S. Treasury yield as of the valuation date, ensuring that our baseline reflects current market conditions.

   iii. **Levered Beta Determination:** The levered beta is obtained by re-levering the unlevered beta of carefully selected comparable companies—Garmin Ltd, Apple Inc., NIKE, Inc., and Lululemon Athletica Inc.—which share

key characteristics with EFD's business. The re-levering uses the target debt/equity ratio (median of our comparable companies) and the standard formula: Unlevered Beta × [1 + (Target Debt/Equity Ratio × (1 – Effective Tax Rate))].

    **iv. Equity Risk Premium:** The equity risk premium is from the Kroll Cost of Capital Navigator, reflecting a long-term, supply-side perspective as of the valuation date.

    **v.** This methodology yields a cost of equity of 20.3%, a figure that accurately reflects market risks and the specifics of the comparable companies used.

    **vi. Cost of Debt Calculation:** The cost of debt is derived by considering the debt/capital ratio—computed as 1 minus [1/(1 + pre-tax cost of debt)]—and then applying an after-tax adjustment (Pre-tax cost of debt × (1 – Effective Tax Rate)). This approach is in line with industry standards and leverages Moody's Baa-rated corporate bond plus a private cost to ensure reliability.

Exhibit B, Page 12-13, Para 29(i-vi).

**Reliability and Methodology- Tested theory or technique**

    3.13    Expert Hakala relied on actual experience and studies to conservatively estimate the percentage of the market, conservatively that would purchase these types of devices or express interest. Exhibit B, Page 13, Para 30.  See discussion of income approach method called discounted cash flow method (DCF).  Exhibit A, Page 4, Para 9.  Additionally, Hakala analyzed the number and types of studios offering boxing, mixed martial arts, and martial arts, along with the likely interest and penetration rates. The data also included reports and studies on typical

early-stage penetration rates within a market. Exhibit A, Page 4, Para 11, Exhibit B, Page 5, Para 14-23.

3.14    The methods Hakala employed are generally accepted in the peer-reviewed academic community and widely used to value businesses such as the business of the Plaintiff at the point in time when the claims arose.  Exhibit B, Page 3, Para 7, Page 13, Para 30.

3.15    The subject business did exist and did have revenues. There is a demand for this product in the marketplace. That is different from a "new business rule" type of business. Exhibit B, Page 3, Para 8.

3.16    The projections for sales, costs, and expenses were based on actual surveys and data that experts use and are appropriate for this business. They were adjusted and explicitly took into account the state of Plaintiff's business at the time. Exhibit B, Page 3, Para 9.

3.17    Contrary to the assertions in the Defendant's Motion, Expert Hakala did not assume that the subject business would reach the size or produce the revenues of "well-established international companies with diversified product lines and dominant positions in their industries." Hakala did not base projections for the subject business on public companies such as "Nike, Lululemon, or Peloton", as falsely asserted. The product was intended for a niche group within the mixed martial arts, boxing, and martial arts community, with a different price point and penetration rate. The revenues projected were a small fraction of what a larger, well-established company with a dominant position would anticipate. Exhibit B, Page 3,4, Para 11(b).

3.18    Contrary to the assertions in the Defendant's Motion, the Plaintiff did have a workable product and revenues, and was able to demonstrate that product. While costs for refinements, further development, and application software were accounted for in our analysis,

these are expected as revenues are realized and the revenue base expands. Exhibit B, Page 4, Para 11(b).

3.19    Established public companies in similar and relevant markets were used solely as a basis for determining the systematic risk portion of the discount rate calculation in Hakala's analysis. Exhibit B, Page 4, Para 12. The Defendant's Motion confuses this and misleads the court by suggesting that these companies were used to project the revenues, costs, and expenses of the Plaintiff's business. That is false. Exhibit B, Page 4, Para 12.

1.1    Contrary to the false assertion by Sarsfield, Hakala did not justify sales projections by comparing EFD to the comparison companies (Garmin, Apple, Nike, and Lululemon Athletica). These companies were used for two things within the model:

a.    The weighted average cost of capital ("WACC") calculation – These companies have markets similar in nature to EFD's product market and all offer wearable technology that allows users to track fitness performance. It is common in calculating the cost of capital and cost of equity to consider companies that are publicly traded in the broader industry order to adjust the equity risk premium for smaller, private companies. To adjust for the smaller size and greater risk, Hakala also include a size premium in the WACC and an unsystematic risk premium of 6%, both based on industry estimates and direct experience when applied to relatively conservative projections.

b.    Hakala also considered capital expenditure projections as a percentage of revenue since the companies are similar in nature. This will tend to overstate the amount of capital expenditures for a device similar to StrikeTec. Specific costs for development and maintenance of the software application component were based on the costs for that type

of application (which Plaintiff had already developed to a certain point previously and had quotes for as well as documented research and experience).

Exhibit A, 4, Para 10, Page 9, Para 13(h), Exhibit B, Page 5, Para 13.

1.21    Each step and aspect of the analysis performed was substantive, conservative, and based actual data. Moreover, the methods employed are academically supported and recommended in authoritative texts, including Damodaran, *Damodaran on Valuation*, Second Edition, 2006; Smith, Smith, & Bliss, *Entrepreneurial Finance: Strategy, Valuation, & Deal Structure*, 2011, specifically Chapter 6: *Methods of Financial Forecasting: Revenue*, Chapter 7: *Methods of Financial Forecasting: Integrated Financial Modeling*, and Chapter 9: *Discounted Cash Flow Valuation* (Section 9.4) and *Matching Cash Flows and Discount Rates* (Section 9.10); and Goedhardt and Wessels, *Valuation: Measuring and Managing the Value of Companies*, Fourth Edition, 2005. Expert Hakala produced a substantial amount of research and documentation that is omitted, misrepresented, or ignored in both Defendant's Motion and in the Sarsfield Report. Similarly, the methods Hakala employed and how he determined his analyses are often omitted from mention or misrepresented in both Defendant's Motion and in the Sarsfield Report.  Exhibit B, Page 2, Para 3.

1.2    **Diffusion of Innovations (Everett Rogers, 2003):** This book introduces the concept of market adoption curves, with innovators representing around 2.5% and early adopters at about 13.5%. This framework is often used to understand how new products enter markets. Exhibit B, Page 8, Para 17(a).

1.3    **The Bass Model** (Bass, 1969) provides a framework for forecasting the adoption of new products based on an initial low penetration that accelerates over time as word-of-mouth and media effects kick in. This model is widely used in academic and practical forecasting and

supports the notion that new product adoption begins at modest rates, which our conservative estimates reflect.  Exhibit B, Page 8, Para 17(b).

    1.4    **Empirical Studies on New Product Adoption**: Research such as that by Tellis, Yin, and Krishnan (2006) in the Journal of Marketing shows that early penetration rates for new products—especially in innovative or niche sectors—are typically very low (often in the 1–3% range) before scaling up over time. This body of work supports the use of low initial penetration assumptions in revenue forecasting for startups and new product launches. See Tellis, G. J., Yin, E. Y., & Krishnan, R. (2006). "Global new product diffusion: A meta-analysis and research agenda." *Journal of Marketing*, 70(3), 56-68.  Exhibit B, Page 8, Para 17(c).

**Reliability and Methodology- Known or potential rate of error**

    1.29    Established public companies in similar and relevant markets were used by Hakala solely as a basis for determining the systematic risk portion of the discount rate calculation in Hakala's analysis.  Exhibit B, Page 12, Para 28 and 29.

    1.30    The costs and expenses ware specific to this product and its associated software application and estimated to ensure room for error, understanding actual margins relative to similar types of products.  The Plaintiff had actual data and information for these costs and expenses, which we increased for scale and marketing based on actual reference data.  Exhibit B, Page 12, Para 28.

    1.30    The weighted average cost of capital ("WACC") calculation – These companies are similar in nature to EFD's product and all offer wearable technology that allows users to track fitness performance. It is common in calculating the cost of capital and cost of equity to consider companies that are publicly traded in order to adjust the equity risk premium for smaller, private companies. To adjust for the smaller size and greater risk, Hakala also include a

size premium in the WACC and an unsystematic risk premium of 6%, both based on industry estimates and direct experience when applied to relatively conservative projections.  See Exhibit B, Page 5, Para 13.

**Reliability and Methodology- Subject to peer review/accepted by scientific community.**

1.31    The methods Expert Hakala employed are generally accepted in the peer-reviewed academic community and widely used to value businesses such as the business of the Plaintiff at the point in time when the claims arose.  Defendant's Motion fails to set forth any reasoned argument as to why the methodologies used by Hakala are not reliable, subject to peer review, and/or accepted by the scientific community.  Defendant's Motion in fact seems to misunderstand and misconstrue the model use by Expert Hakala in this case.

**Federal Rule of Evidence 403**

1.32    Defendant's argument with respect to Federal Rule of Evidence 403 is dependent on this case having a jury that could be confused.  Defendant also assumes that no limiting instruction could save the jury.  This case is not set for a jury trial.

1.33    Furthermore, as set forth in the Hakala opinion, the Hakala Declaration, and this response Expert Hakala's opinion is not based on speculation.  Because his credentials are considered too good, that is not a reason to exclude his opinion.  Defendant may not like the extent its actions harmed the Plaintiff and the numbers generated from Hakala's opinion, but that does not mean Expert Hakala's opinion is nothing more than hope.  The numbers speak for themselves.  It is undisputed that Bally's agreed to a $10,000,000.00 budget for this project.  Its recorded as Bally's recognized the value of this project to the Plaintiff.

1.34    There is no risk of probative value the evidence of damages to the Plaintiff being outweighed by a "danger" of unfair prejudice, confusing the issues, misleading a jury, undue

delay, wasting time, or needlessly presenting cumulative evidence in this case.    See, Federal Rule of Evidence 403.

`    **IN CONCLUSION,** Defendant's Motion to Strike should be **DENIED.**    Plaintiff's expert Scott D. Hakala's report meets every Daubert standard as he is qualified to give the opinion, the opinion is relevant to damages in this case, and the theory or technique have been tested;  subjected to peer review; there were standards controlling the technique's operation; and the theories or methods have been generally accepted by the scientific community.