UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| **EFD SPORTS, LLC,**<br>*Plaintiff*, | § § § § § § § | |
| v. | § § § | CIVIL ACTION NO. 4:24-CV-87-SDJ |
| **BALLY'S CORPORATION,**<br>*Defendant.* | § § § | |

### AFFIDAVIT OF SEAN SARSFIELD

| | | |
|---|---|---|
| STATE OF ILLINOIS | § § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF COOK | § | |

BEFORE ME, the undersigned notary public in and for the State of Illinois, on this day personally appeared SEAN SARSFIELD, the affiant, a person whose identity is known to me and whose name is subscribed below. After I administered an oath to affiant, affiant testified:

1. My name is Sean Sarsfield. I am over the age of eighteen (18) years, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2. I have been asked by counsel to respond to the Declaration of Scott D. Hakala, Ph.D., CFA in Response to Defendant Bally's Corporation's ("Bally's") Motion to Exclude the Expert Report, Testimony, and Opinions of Scott Hakala (the "Response").

3. I have been retained as an expert witness by the Defendant in this action. I have prepared a report in this action containing my credentials, identifying the documents and materials I relied upon, and setting forth my opinions, including my opinions regarding the deficiencies in

1

Exhibit C

Scott Hakala's report. This report provides a detailed analysis of my evaluation of Mr. Hakala's methodologies and conclusions. If called to testify, I would provide testimony consistent with the findings and opinions presented in my report.

4. As discussed further below, it is my opinion that Scott Hakala's projections are speculative, rely on assumptions that are unsupported, do not align with the facts of the case, and cannot be reasonably relied upon. Specifically, Mr. Hakala:

- Does not base his opinions on sufficient facts or relevant data;
- Uses flawed revenue projection methodology;
- Ignores the actual historical financial data for EFD Sports, LLC ("EFD") and the technology they developed known as "StrikeTec", and
- Fails to properly analyze the relevant market.

5. Based on Mr. Hakala's report and supporting schedules, it is clear he did not rely on the facts present in this case or obtain sufficient relevant data to make a reasonable estimate of damages in this matter. He provides no support for numerous assumptions present in his calculation. More importantly, he chose to ignore the actual financial performance of EFD and the StrikeTec product while not performing any analysis of the existing and relevant market for StrikeTec.

## *NEGOTIATIONS BETWEEN BALLY'S CORPORATION AND EFD*

6. I am not aware of any agreement executed between Bally's and EFD for the StrikeTec product. Over time, proposed terms for a potential agreement evolved for the commercial side of the StrikeTec product, but my understanding is that EFD was always free to negotiate with other parties for both the consumer and commercial use of the product. I am not aware of an executed agreement between the parties that restricted EFD from doing so.

2

7.      Mr. Hakala's calculation appears to ignore the fact that, even if EFD believed it could not market or sell licensing for the commercial side of the business during its negotiations or after an agreement was actually formed, the documents and claim of EFD makes clear that EFD was always able to market and sell licensing for the consumer side. There is no basis for Mr. Hakala's assumptions that negotiations with Bally's impeded EFD from moving forward with a potential deal with EntroBox, LLC, rendering Mr. Hakala's "EntroBox Scenario" unnecessary and irrelevant.

8.      Further, according to Mr. Hakala, EFD had an existing, marketable product that was earning revenue prior to discussions with Bally's.[1] Therefore, there was nothing stopping EFD from selling or licensing their product to other buyers or to continue to market to consumers.

*INTRODUCTION OF NEW INFORMATION*

9.      Mr. Hakala's Response introduces several new studies and valuation treatises that were not referenced in his original report. These additions are possibly a result of my criticisms pointing out the lack of support and references for various assumptions made in his report. In paragraph 3 of his Response, Mr. Hakala broadly refers to various chapters from a text written by Aswath Damodaran as support for the methodology applied in his report, but he did not cite to this text in his original report. Similarly, in paragraph 17 of his Response, he broadly refers to various frameworks/concepts that were not mentioned in his report.

10.     Regarding his revenue projections, he continues to ignore the actual historical financial performance of EFD and StrikeTec but instead relies upon various studies that have no relevance to EFD or this product. Many of these studies are over twenty years old and were performed before today's wearable fitness trackers (and similar products) even existed. Mr.

---

[1] Hakala Response, para. 8.

Hakala fails to justify the statistics he is relying on as a reasonable basis for the projection of potential sales of EFD. These studies should not be considered relevant or reliable for the projection of revenues associated with StrikeTec.

11. Mr. Hakala points to his credentials as the reason why his calculation can be relied upon but fails to address the obvious flaws in his calculation. The underlying data and assumptions used to perform his valuation are inappropriate and cannot reasonably be relied upon. More importantly, he ignores real world data available to him including the actual historical financial performance of EFD and sales of the StrikeTec product. At no point in his analysis does he attempt to perform a reconciliation or similar analysis of the actual performance of the company and adoption rates of StrikeTec by the target market to the hypothetical projections he creates from unsupported assumptions.

*VALUATION EXPERTISE*

12. Mr. Hakala stated that I am a forensic accountant and not a valuation expert, which is incorrect.[2] I have performed valuations for various purposes, both inside and outside of litigation, throughout my career. I have presented on valuation topics and provided valuation related opinions in expert reports and testimony on valuation related issues. I have held the Certified Valuation Analyst ("CVA") credential from the National Association of Certified Valuators and Analysts since December 2007. CVAs are Certified Public Accountants ("CPAs") or individuals with business degrees that use established standards to estimate the economic value of businesses for purposes related to business purchases and sales, as well as disputes related to divorce litigation, taxes, partners' ownership interests, contested estates, and other purposes.[3]

---

[2] Hakala Response, para. 4.
[3] https://www.nacva.com/

4

13. This designation requires an applicant to meet certain criteria just to be eligible, including the performance of a valuation case study for evaluation and passing a comprehensive, five-hour, proctored examination. In addition, one of the paths to be credentialed (which is the path I took) is to hold an active, valid, and unrevoked CPA license to practice accounting that is issued by a legally constituted state government authority. Obtaining and retaining a CPA license requires additional experience, testing and compliance that can fall outside of the requirements of the CVA (meaning there are additional prerequisites to obtaining the CVA credential). Further, in order to maintain the CVA credential I am generally required to complete 60 hours of continuing professional education every three years.

*NEW BUSINESS RULE*

14. Mr. Hakala considers EFD a startup only when it is advantageous to his client. In his Response Mr. Hakala states, "[t]he subject business did exist and did have revenues. There is a demand for this product in the marketplace. That is different from a 'new business rule' type of business".[4] However, he applied a "startup" methodology in his valuation calculation. For example, in paragraph 13.j of his report: "To calculate working capital, I started with the industry average sales-to-working capital ratio and adjusted it based on my assumption. Initially, I set this ratio to 2.5, as **startups** typically have a lower ratio due to significant investments in inventory, marketing, and operations while sales are still scaling. Additionally, **startups** typically experience less favorable payment terms with suppliers and customers. As the business grows, the ratio increases to 3.45 over time." Therefore, per Hakala, EFD has enough historical revenue to avoid the "new business rule" when it is convenient for the purpose of his calculation, but not enough to apply the working capital ratios of an established business.

---

[4] Hakala Response, para. 8.

15. As discussed in my report, the "new business rule" precludes a new business from seeking lost profits because of the level of speculation involved and the difficulty in obtaining reasonable certainty in making such a claim.[5] While some speculation may be unavoidable, the more relevant and reasonable the analysis, the better.[6] Further, the expert's goal should be to minimize the number of uncertain components in any new business damages claim.[7] Here, Mr. Hakala applied many unsupported assumptions and ignored the actual financial performance of EFD and the StrikeTec product.

16. Some of the factors an expert should consider when assessing the probability of success for a new business include whether it is a unique or proprietary technology or service; the reasonableness of revenue and expense forecasts; the size of the market; and whether there is demonstrated market acceptance.[8] First, the product was not unique. In 2021, around the time of the potential deal, there were already multiple punch tracking devices on the market.[9] Next, the forecasts were not reasonable. Mr. Hakala forecasted a 2,000% increase in revenue from 2021 to 2022.[10] Further, and as discussed later, Mr. Hakala's analysis of the size of the "addressable market" is significantly overstated. Finally, there is sufficient real-world evidence proving there is no demonstrated market acceptance, including EFD's own inability to generate momentum for their product and other major brands in boxing, including Everlast, attempting, but ultimately failing to create a successful similar product during this time.[11]

---

[5] Fannon, N. (2020). *The Comprehensive Guide to Economic Damages Volume One* (J.M. Dunitz, Ed.) (6th ed., p.280). BVR.
[6] Fannon, N. (2020). *The Comprehensive Guide to Economic Damages Volume One* (J.M. Dunitz, Ed.) (6th ed., p.362). BVR.
[7] Fannon, N. (2020). *The Comprehensive Guide to Economic Damages Volume One* (J.M. Dunitz, Ed.) (6th ed., p.362). BVR.
[8] Fannon, N. (2020). *The Comprehensive Guide to Economic Damages Volume One* (J.M. Dunitz, Ed.) (6th ed., p.364-365). BVR.
[9] https://expertboxing.com/boxing-punch-trackers-review.
[10] Hakala Report, Schedule B.2-2.
[11] https://kiteforum.com/viewtopic.php?t=2409550.

17. What Mr. Hakala fails to consider, even though he demonstrates it in his own report, is EFD's historical inability to generate profits. Per Hakala's report, EFD's net income was negative from 2019 through 2021 with operating expenses exceeding revenues in each year.[12] Further, Mr. Hakala has stated that the business is currently not generating any revenues. These are important data points that Mr. Hakala ignores in his projections. He bases his projections on irrelevant studies and unsupported assumptions, instead of the actual performance of the company and StrikeTec.

18. Mr. Hakala's calculation relies on inaccurate and unreliable assumptions and data with no additional support other than "experience" or "management's estimates".[13] By his own admission, the financial information he received from EFD "were not in good order."[14] His projections assume that the annual revenues for EFD would increase from approximately $79,000 in 2021 to $1.69 million in 2022, an increase of over 2,000%.[15] Looking at the timeline of EFD's communication with Bally's, an agreement was still being negotiated as late as November 2021, the finalization and execution of any agreement was unlikely to occur until sometime in 2022, if at all, and EFD had noted supply chain delays.[16] Mr. Hakala fails to provide any support that would justify an increase in revenues of this magnitude ever being achieved, let alone in this time frame, nor does he demonstrate that EFD had the existing infrastructure and support network to reasonably justify these projections.

---

[12] 2019_12_31_Tax_Return_EFD_WesElliott.pdf, 2020_12_31_Tax_Return_EFD_WesElliott.pdf, and 2021_12_31_Tax_Return_EFD_WesElliott.pdf.
[13] Hakala Report, para. 12.d and 15, for example.
[14] Hakala Report, para. 6.
[15] Hakala Report, Schedule B.2-2.
[16] Plaintiff's First Amended Complaint.

*ADDRESSABLE MARKET*

19. Mr. Hakala stated there is a demand for this product in the marketplace but fails to provide any current real-world examples to support this opinion. Research I performed and detailed in my report indicates otherwise.[17] Further, in paragraph 12.a of his report, he states, "I assume zero revenue going forward, as Mr. Elliott mentioned there are currently no revenue opportunities in place and the company is low on cash. This reflects the lack of capital and contracts and minimal positive momentum at this time."[18] Mr. Hakala's own statements indicate there was little demand for this product in the marketplace.

20. Further, his "addressable market" is based on an inflated population of participants. As the basis for his projections, Mr. Hakala relies on statistics from the web site Statista which details the number of individuals in the United States that participate in boxing and MMA. Mr. Hakala appears to be double counting the potential customers in his calculation as the boxing participation numbers used by Mr. Hakala already include MMA participants. In his Response, Mr. Hakala argues there is a distinction between fitness mixed martial arts and traditional martial arts. This fails to address that there may be participants of both fitness mixed martial arts and traditional martial arts.

21. More importantly, Mr. Hakala presents this participant information on an annual basis going back to 2018 for boxing and 2010 for martial arts yet fails to reconcile any of this information to the actual performance of EFD's StrikeTec product during this period.

22. His participation data also includes randomly selected countries with no discussion regarding the logic behind his selection.[19] He also selects participation rates for these countries

---

[17] Hakala Response, para. 8 and Sarsfield Report, pp. 14-15.
[18] Hakala Report, para. 12.a.
[19] Hakala Report, para. 11.d.

8

with no support or factual basis for doing so. A properly performed analysis would show some basis for the projections, such as actual historical sales data to demonstrate countries where sales were previously made as a basis for where future customers would likely exist.

23. In his projections, the various inputs, including the growth rate, penetration rate, hardware-to-subscription conversion, churn rate, and attrition rate, have all been applied with no support and without showing they are based on reasonable or relevant data. EFD would have this information for the actual historical performance of StrikeTec, but Mr. Hakala appears to have ignored this information and didn't reconcile his projections to them. As I noted in my report, Mr. Hakala's projections do not appear to be reasonable when compared with the actual historical performance of EFD and StrikeTec.

24. Valuation expert Shannon Pratt has stated "It is difficult to overemphasize the importance of thorough and relevant economic and industry research for a well-prepared business valuation."[20] Mr. Hakala states that he performed a market analysis, when in reality he failed to perform any substantive or minimal analysis of the relevant data available to him. Instead of taking actual performance data relating to the sales of StrikeTec and the adoption rate for what he deems the Total Addressable Market, Mr. Hakala relies on studies that were published decades ago (he even references one from 1969).[21] Pratt has also stated "as with any valuation method, the quantity and quality of relevant data available to implement it will have an important bearing on the usefulness of the method".[22] It is unclear why Mr. Hakala would choose to ignore the product and

---

[20] Pratt, S. P. (2022), *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* (6th ed., p. 98). McGraw Hill.
[21] Hakala Response, para. 17.b.
[22] Pratt, S. P. (2022), *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* (6th ed., p. 291). McGraw Hill.

company specific data available to him and instead rely on studies conducted before the StrikeTec product even existed.

25. As pointed out in my report, there are numerous competing products that exist in the real world that have failed to gain any traction in the marketplace.[23] This includes a tracker that was marketed by Everlast, a brand that has been synonymous with the sport of boxing for decades.[24] Mr. Hakala appears to ignore this real world data, nor does he attempt to analyze sales of competing products, how they actually impacted the sales of StrikeTec products, and more importantly why none of these real world products that offer similar functionality have generated the level of revenues that Mr. Hakala projects in his report.

26. While a large part of Mr. Hakala's assumption is that association with Bally's would create an instant market of acceptance resulting in sales, he again ignores the real-world experience of EFD with its StrikeTec product. Over the years, the StrikeTec technology has been associated with some of the largest professional organizations in combat sports – Bellator[25], Ultimate Fighting Championship (more widely known as the UFC), and professional boxing.  In each of these instances, the StrikeTec product has been marketed with these organizations in various ways to the very target market that would be most likely to purchase it.

27. **Professional Boxing** – StrikeTec has been associated with professional boxing for approximately a decade, as the concept was initially presented through DirectTV's Big Knockout Boxing**.**[26, 27]  The consumer offering of the StrikeTec product debuted in 2017, when it was

---

[23] Sarsfield Report, pp. 14-15.
[24] Sarsfield Report, pp. 14-15.
[25] Bellator Fighting Championships was founded in 2008 as a mixed martial arts organization and a competitor to UFC.
[26] https://www.realitychecksystems.com/news/press-releases/directv-partners-with-reality-check-systems-to-bring-real-time-data-to-big-knockout-boxing-series/
[27] https://www.prweb.com/releases/efd_sports_striketec_sensor_technology_to_be_used_in_bkb_boxing_events/prweb12561679.htm

demonstrated during the 2017 Consumer Electronics Show by (then undefeated WBC Continental America Championship boxer) Ryan Martin.[28] More recently, the product was used in a sanctioned boxing match in 2021, but there still does not appear to be a demand for the product.[29]

28.    **Mixed Martial Arts** – In the professional MMA realm, the StrikeTec technology has been associated with both Bellator and the UFC, two of the more popular mixed martial arts organizations in the world. StrikeTec's own YouTube channel has several videos that promote its relationship with both entities and EFD's owner was quoted in an article in 2016 discussing a relationship with both entities while potentially moving forward with other organizations.[30, 31] The UFC even went so far as to host fan events where fans could try out StrikeTec technology on their own.[32, 33] Neither of these relationships and the exposure to potential customers yielded any financial success or established that a market existed.

29.    Mr. Hakala ignored these real word examples of EFD's inability to capitalize on these opportunities as demonstrated by StrikeTec's historical lack of sales, profits and acceptance into the target market despite being associated with some of the biggest combat sports names in the world.

30.    Therefore, it is my opinion based on this data and my education, training and experience that Scott Hakala's projections are speculative, rely on assumptions that are unsupported, do not align with the facts of the case, and cannot be reasonably relied upon.

---

[28] https://www.prnewswire.com/news-releases/striketec-brings-interactive-data-to-the-fight-with-advanced-mma--boxing-wearable-300392679.html
[29] I noted during the bout there appeared to be various technical issues. https://www.mmafighting.com/2021/6/11/22529349/missed-fists-ballys-fight-night-event-introduces-augmented-reality-power-bars
[30] https://www.youtube.com/@StrikeTec
[31] https://the-cauldron.com/sports-technology-and-mma-belong-together-how-one-wearable-could-boost-fighters-striking-powerour-d72372d35f67
[32] https://www.rfidjournal.com/news/nfc-gets-in-the-ring-at-ufc-fan-village-2/70796/
[33] https://www.youtube.com/watch?v=huxwdavcTMc

FURTHER AFFIANT SAYETH NAUGHT.

SIGNED on the  10th  day of  March  2025.

_____
SEAN SARSFIELD

SUBSCRIBED AND SWORN TO BEFORE ME the undersigned Notary Public, on this the  10  day of  March  2025, to certify which witness my hand and seal of office.

OFFICIAL SEAL
CHARLES PAREKH
NOTARY PUBLIC - STATE OF ILLINOIS
COMMISSION #898555
MY COMMISSION EXPIRES JULY 24, 2027

_____
NOTARY PUBLIC in and for the State of Illinois
My Commission Expires: 7/24/2027

12