**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **EFD SPORTS, LLC** | § | |
| | § | |
| **v.** | § | **CIVIL NO. 4:24-CV-87-SDJ** |
| | § | |
| **BALLY'S CORPORATION** | § | |

### PLAINTIFF'S SECONDED AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, Plaintiff in the above entitled and numbered cause of action and files its

First Amended Complaint pursuant to this Court's Order dated February 23, 2024, and would

respectfully show unto the Court as follows:

### RULE 47 STATEMENT OF DAMAGES

Plaintiff seeks monetary relief over $1,000,000.00 and other relief.

Plaintiff reserves the right to amend damages amounts, as discovery continues and

damages increase.

### I. THE PARTIES

1.1     Plaintiff EFD SPORTS, LLC ("EFD") is a Texas Limited Liability Company with

its primary place of business at 2508 Juniper Ln., Northlake, TX 76226-3260, and may be served

via his counsel of record in this case.

1.2     Defendant BALLY'S CORPORATION ("Bally's") is an Delaware Corporation

and may be served via the Texas Secretary of State at its principal place of business located at

100 Westminster Street, Providence, RI 02903.  Upon information and belief, Defendant is not

registered as a foreign corporation to do business in the State of Texas.

### II. JURISDICTION

PLAINTIFF'S SECOND AMENDED COMPLAINT, Page 1

2.1    The Court has jurisdiction in this case pursuant to 28 U.S. Code §1332, as matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between parties whom are citizens of different States.

### III. FACTS

**StrikeTec/EFD Sports, LLC**

3.1    Wes Elliott is a Texas resident who owns EFD Sports, LLC.  EFD Sports, LLC developed and owns technology known as "StrikeTec".  EFD Sports, LLC is a Texas Limited Liability Company located in Denton County, Texas.

3.2    StrikeTec is proprietary technology owned by EFD Sports, LLC that integrates software and hardware into sensors worn by fighters, both in boxing and MMA, which allows the measurement and analysis of strikes and strike force generated by the puncher either during training or during a fight.  The devices have historically been marketed to gyms, trainers, and fighters in the consumer market to assist with training, along with providing on-screen real time punch stats for a broadcasted boxing or MMA match as shown on DirecTV.

**Bally's Corporation**

3.3    Soo Kim, is the CIO of Standard General, L.P.  Standard General, L.P. is the largest shareholder for Bally's Corporation.  Soo Kim is on the Board of Directors for Bally's Corporation and at one time acted as Chairman.

3.4    On February 20, 2021, Soo Kim sought out Wes Elliott (in Texas) via Linked-In on behalf of Bally's Corporation as Chairman of the Board to inquire about StrikeTec and its applications.  Soo Kim stated that he had found StrikeTec on the internet.

**Proof of Concept**

PLAINTIFF'S SECOND AMENDED COMPLAINT, Page 2

3.5     Bally's Corporation was interested in StrikeTec for the purpose of integrating the technology and devices into an existing application used for sports betting known as Monkey Knife Fight.  Monkey Knife Fight was acquired by Bally's in early 2021. The concept would allow expanded and live arena and application based betting during live fights broadcast by various Bally's media based on the measurements taken by StrikeTec during the fights (the Commercial Product).

3.6      On May 11, 2021, Wes Elliott is introduced to Bally's team lead Adi Dhandhania, former COO of Ballys Corp, to begin discussions on a proof of concept for the Commercial Product for Ballys, to take place on June 9, 2021.

3.7     StrikeTec created a proof of concept event with Bally's Corporation, whom at that time had also partnered with boxer Oscar De'La Hoya's, Golden Boy Promotions.

## EntroBox, LLC Opportunity

3.8     On June 7, 2021, EFD Sports, LLC was offered a partnership opportunity with EntroBox, LLC for marketing and development of StrikeTec technology to combat sports consumers and via retail to IOS and Android technology users (the Consumer Product).

3.9     EntroBox, LLC, led by J3G Global's James Wilent and World Champion boxer Ronald Johnson, had developed a broad market and influence in the combat sports market, to include promotion of live boxing events and entertainment through both digital and network tv distribution.  Entrobox, LLC signed a multi-year partnership with media conglomerate Sinclair Broadcast Group, Inc. and secured Logan Paul, one of the world's most well-known influencers in the world, to its roster.

3.10    The EntroBox, LLC deal was worth approximately $3,000.00.00 to EFD Sports, LLC. to include consumer marketing with Youtuber Logan Paul and brother Jake Paul.

PLAINTIFF'S SECOND AMENDED COMPLAINT, Page 3

**The Exclusive Agreement**

3.11    On June 9, 2021, Wes Elliott travelled to California to work on the Bally's Fight Night broadcast which would be the proof of concept for the StrikeTec technology and fight sensors.

3.12    With the proof of concept proving to be a workable integration and viable product for Bally's, Wes Elliott met with Soo Kim and Adi Dhandhania on June 24, 2021 to negotiate a deal.  At that meeting, the parties agreed to the venture and Soo Kim requested a Scope of Work ("SOW1") from EFD Sports, LLC.  Bally's was buying the prebuilt software application to integrate into their system for use in gaming.  This took StrikeTec effectively off the market while this project was ongoing so that a commercial product would be developed from the existing platform.

3.13    Wes Elliott was told by Soo Kim and Adi Dhandhania that all of his resources would need to be allocated to the Ballys/StrikeTec project until completion, and that Bally's would require EFD Sports to work exclusively with them during this period.

3.14    On July 1, 2021, Wes Elliott sent a Scope of Work to Soo Kim, who then forwarded the Scope of Work to Adi Dhandhania's team, as Adi necessarily hired new employees for the project.  The budget for the project that was proposed was $10,000,000.00. *See* Exhibit 1 ("SOW1).  On July 7, 2021, Wes Elliot emailed Soo Kim expressing the reason for keeping SOW1 at a high level and explaining his reasoning for the budget.  Soo Kim responded on July 7, 2021, and confirmed that he was "chewing" on SOW1, considering the terms.

3.15    On July 13, 2021, Soo Kim agreed to the Scope of Work and the budget.  Soo Kim wrote "Thank you for this detailed SOW. It's what we need.  We are committed, and are willing to commit the budget you are asking for to get it done."

3.16    Further, Soo Kim confirmed development for exclusively commercial use and that Plaintiff would retain all consumer rights.  Soo Kim indicated that Bally's preferred to budget each element (phase) and not to write a large check up-front, but pay as they go.  Soo Kim also wanted to provide marketing assistance for the consumer side as all of EFD Sports, LLC efforts would be required to be directed towards the Bally's project.

3.17     On July 14, 2021, Soo Kim communicated that a manager would be assigned to work with Wes Elliott to market the consumer product.  Also on of July 14, 2021, Soo Kim, copying Adi Dhandhania, indicated that they would be finding a Project Liason to assist in breaking up the larger SOW1 ($10mil) into specific items.  Based on representations and promises by COO of Ballys Adi Dhandhania, EFD Sports, LLC was told that they could not enter into the partnership with EntroBox, LLC for reasons that the Bally's Agreement was exclusive.  Wes Elliott dedicated workers to start the process of meeting the Scope of Work deadlines.

### Payment is no issue- hurry up and finish

3.18    On July 18, 2021, Wes Elliot and Soo Kim discussed the budget and intention of the parties.  Soo Kim stated that Bally's was in for $10,000,00.00.  Soo Kim confirmed that the $10,000,000 was funding the build for the redevelopment via integration and enhancement for gaming purposes.  Soo Kim confirmed the deal for commercial use and stated "You know you said Hey I need 10 million to develop this new thing right?...up to 10 million...for that I want the commercial use and you get the consumer use."

3.19    On that same call, Soo Kim stated that he recognized that a portion of the $10,000,000.00 was for exclusivity.  Soo Kim stated that it was a fair deal.  Soo Kim stated that he understood that part of the money was for overhead for product already developed.  Soo Kim

repeatedly expressed that they needed to "get going" and "we gotta build this thing like yesterday". Soo Kim promised that they could assist with marketing by calling the Commercial Product "StrikeTec Bally's" or "Bally's StrikeTec".

3.20    Soo Kim wanted to spread the $10,000,000.00 over the course of different steps in the project to keep interests aligned and incentivize speedy completion. On July 28, 2021, Soo Kim again confirmed he was "up to 10 million" and that the money was being spent to develop the commercial use. Soo Kim stated that was "relatively fair". Soo Kim confirmed the exclusivity of the deal and acknowledged that some overhead was paid for Wes Elliot's attention and exclusivity. Again, Soo Kim repeatedly expressed that this project needed to be completed very quickly and encouraged Wes Elliot to get going and that payments could be made at $1million to $2millon at a time. Soo Kim stated "We gotta move quickly man. We're gonna, wer're gonna spend, I think its gonna be million dollars at a time, Is it one, two, or three? We go, we gotta go, we gotta build this thing, like yesterday, you know?".

3.21    On August 9, 2021, the parties met via Zoom. Wes Elliott, Soo Kim, and Sina Miri were on the Zoom call. Sina Miri was part of Adi's innovation team. Sina Miri wanted to meet with Wes Elliott to discuss breaking down the original Scope of Work ("SOW1") into budgeted phases as previously expressed by Soo Kim. The parties discussed revisions to SOW1 and discussed technology issues.

3.22    On the Zoom call, Soo Kim confirmed that Sina was assigned to the project and Sina requested additional testing but Soo Kim stated that they were on the same page as to what they were trying to get done, in what order, and what it would cost. After being asked to share the source code, Wes Elliot became concerned that he would be turning over technical knowledge to Bally's to enable them to build the technology on their own. Soo Kim stated that

his bond was his word, he would never do that to Wes Elliot, and that the only consideration was if the product worked or did not.   Wes Elliot agreed to produce data and did so via a shared google drive with respect to the product's current accuracy rate.  Soo Kim confirmed that he knew that it worked so that was not a concern and that if Bally's tried to build the technology without EFD, then Kim would take out a front-page ad in the Wall Streed Journal eating his shoe.  Again, Soo Kim wanted to move quickly and admitted that the engineers, Sina and Sam did not work on gut feeling, but that Soo Kim's gut feeling told him the technology worked and wanted to push forward quickly to be first to market.

3.23    On August 10, 2023, Wes Elliott circulated a second Scope of Work ("SOW2") breaking down each phase into more specific tasks and assigning a value as asked and discussed by the parties.  SOW2 was not a new agreement but a revision of SOW1 into more defined phases.  The completion of Phase 1, for instance, was budget at $2,000,000.00.  EFD Sports, LLC began work on Phase 1 to meet the requirements for a November 2021 Boxing event as discussed with Adi Dhandhania.  See Exhibit 2 ("SOW2).  On August 24, 2021, Phase 1 of the SOW2 was updated to an agreed $500,000 for certain progress.  See Exhibit 3, Email 8/24/21.

3.24    In July, Sina Miri introduced Wes Elliot to his brother Sam Miri, in order for Sam Miri to pursue a position with Wes Elliot to work on the project.  Sam Miri wanted $300,000.00 per year plus equity with EFD Sports.  Wes Elliot declined and informed Soo Kim.

**The Switcharoo-Licensing Agreement.**

3.25    In September of 2021, a Technology Licensing Agreement was presented to EFD Sports, LLC provided by Sina Miri that was substantially different and contradicted the previously agreed terms contained in SOW2 (agreed to on a previous Zoom call and as revised 8/24) and the previous agreements made with Soo Kim.  Most glaringly, Bally's sought a

royalty-free, perpetual, irrevocable, worldwide, sub-licensable use, including a royalty-free, perpetual irrevocable, worldwide, transferable, and sublicensable right to create derivative works from of the Licensed Technology (defined as Software and, Hardware and Data, along with all accompanying intellectual property rights therein and related thereto, including all derivative works thereof, as exists on the Effective Date and thereafter) for $500,000.00.  The agreement essentially awarded the product to Bally's Corporation to do with as they pleased to the exclusion of EFD Sports, who had been promised payment and retained rights to the consumer project, but received nothing.

3.26     EFD Sports did not agree with the Licensing Agreement's terms and reminded Bally's of the two SOWs and the agreed upon budget and phased payments.  Again, the SOWS were for agreed exclusivity and development of the commercial product, the proposed Licensing Agreement was a separate agreement that was to be for the use of the technology. Adi Dhandhania expressed concerns with version of the Technology Licensing Agreement introduced into the mix stating that the language needed to be consistent with the original agreement.

3.27     On September 29th, 2021, Adi, Sina, Wes and EFD Sports LLC's attorney Dave Steiner met via Zoom call to clarify any final changes and agree on final changes. Bally's asked Dave Steiner to continue the formation of the Technology Licensing Agreement to allow use of technology in the November event and remove the overly broad language to revert back to the original intent of the agreed upon SOWs and adding a clause tying each phase together and to be funded 60 days before completion of that phase.  The License Agreement attempted to change the terms of the SOWs to only a $500,000.00 payment.  EFD Sports, LLC repeatedly, reiterated

that these terms were not consistent with the previously agreed upon terms and requested $2,000,000.00 for six month exclusivity.

3.28 On October 1, 2021, Bally's team Adi Dhandhania and Sina Miri received a final draft of the Technology Licensing Agreement as discussed on September 29, 2021 Zoom call from Dave Steiner. Sina Miri expressed that the team was traveling overseas for a conference and would have newly hired employee and brother Sam Miri who would be assigned as new team manager. This is the same Sam Miri who was turned down for employment by Wes Elliot after a request to work on this project for $300,000.00 plus equity in Plaintiff.

3.29 On November 14, 2021, Sam Miri acknowledged the terms of the parties' previous agreements, but stated he did not have time at the moment due to his workload to continue with the Technology license. However, he would report with the team about payment for work completed under the SOWs. Payment was never received. Sam Miri stated that Bally's would not be moving forward with the overall project because he was busy with other items and there was too wide a gap between the parties. He stated that he agreed to release EFD Sports from being hindered so that EFD could market for the holiday season (a month away, and despite Ballys having required exclusivity since June). The gap was described as the difference in the agreed upon terms contracted for the $10,000,000.00 cost for the exclusivity and development of the pre-existing platform into the Commercial Product for betting services and the details of the Licensing Agreement to allow use of the technology for EFD Sports (a separate component of the overall agreement).

3.30 In short, Sam Miri decided to terminate the deal because Bally's realized that they would not be getting full control over the Commercial Product to build upon and then market themselves as they saw fit (including potential consumer use) along with other oppressive terms

in the Licensing Agreement at a price they forced onto EFD Sports after already agreeing to the SOWS.  Sam Miri did not agree to pay what Soo Kim had already agreed to.  It can be inferred that Sam Miri also held a grudge because was not hired by Wes Elliot not because the technology did not work or that the parties were far apart.  So, Bally's killed the deal and paid EFD Sports nothing.

3.31    On November 26, 2021, Soo Kim emailed Wes Elliott and confirmed that Bally's was pulling out of the project, although Soo Kim did not understand why his team was so far apart regarding the Licensing Agreement because Soo Kim and Wes Elliott agreed to a simple framework.  See Exhibit 5.

3.32    The following evidence supporting the claims made herein is additionally attached hereto and can be found at the links provided herein below:

6.  November 19, 2025, Bally's and BKB Bare Knuckle Boxing Launch Fully Integrated 360 Partnership in Technology, Venue, and Broadcast Distribution.

7.  Authorization letter of Sam Miri to sign regulatory filings.  March 2, 2023.

8.   FCC Testing Documents

9.  SDoC testing attestation- Signed by Sam Miri.  1/31/2023.

A.  https://www.youtube.com/watch?v=nz97JW2PxYc
Uzbekistan presentation of sensor technology 2023.

B.   https://www.youtube.com/watch?v=tWaljDTunEA
July 2025 Boxing demonstration of sensor technology in use.

## IV. CAUSES OF ACTION

4.1     All causes of actions herein below, to the extent necessary, are pled in the alternative pursuant to Texas Rule of Civil Procedure 48.

**First Cause of Action—Breach of Contract.**

4.2     Plaintiff and Defendant came to an agreement via SOW1 and SOW2 (as amended) (the "Contract for Commercial Use").  The agreement to develop the existing platform for Commercial Use required Plaintiff to perform under the terms of SOW1 and SOW2 for approved budgeted amounts along the Phases of completion.  See Exhibit 4 (Soo Kim 7/14/21 agreement to Sow1).

4.3     Plaintiff began performing pursuant to the contract and Bally's knew and accepted Plaintiff's work on the project.

4.4     Plaintiff invoiced Defendant for Phase 1 of the project.

4.5     Defendant failed to pay the agreed budgeted amount for Phase 1.

4.6     Defendant breached the contract by failing to pay amounts owed when due. Defendant further breached the contract by terminating same despite accepting work performed by Plaintiff.

4.7     Plaintiff was damaged as a result of Defendant's breaches.

**Second Cause of Action— Quantum Meruit**

4.8     Plead in the alternative pursuant to Federal Rule of Civil Procedure 8, Plaintiff provided valuable materials or services to Defendant.

4.9     The services or materials were provided for the Defendant.

4.10    Defendant accepted the services or materials.

4.11    Defendant had reasonable notice that the plaintiff expected compensation for the services or materials and failed to pay same.

**Third Cause of Action- Negligent Representation.**

4.12    Defendant made a representation "in the course of his business" or in pursuit of a transaction where Defendant had a personal financial interest by stating Defendant approved the SOW1 and SOW2 budgets, repeatedly agreeing to the $10,000,000.00 payments over time, agreeing that exclusivity along with the already existing platform had value in calculating the cost to Bally's up to $2,000,000.00, and requiring Plaintiff abandon other deals, and inducing Plaintiff to begin and complete work on the Project.

> WHO:  Soo Kim
>
> WHAT:
>
> "Thank you for this detailed SOW. It's what we need.  We are committed, and are willing to commit the budget you are asking for to get it done."
>
> "You know you said Hey I need 10 million to develop this new thing right?...up to 10 million...for that I want the commercial use and you get the consumer use."
>
> Soo Kim stated that he recognized that a portion of the $10,000,000.00 was for exclusivity.
>
> Soo Kim stated that it was a fair deal.
>
> Soo Kim stated that he understood that part of the money was for overhead for product already developed.
>
> Soo Kim repeatedly expressed that they needed to "get going" and "we gotta build this thing like yesterday".
>
> Soo Kim promised that they could assist with marketing by calling the Commercial Product "StrikeTec Bally's" or "Bally's StrikeTec".
>
> Soo Kim confirmed he was "up to 10 million" and that the money was being spent to develop the commercial use.
>
> Soo Kim stated that was "relatively fair".

PLAINTIFF'S SECOND AMENDED COMPLAINT, Page 12

Soo Kim confirmed the exclusivity of the deal and acknowledged that some overhead was paid for Wes Elliot's attention and exclusivity.

Soo Kim repeatedly expressed that this project needed to be completed very quickly and encouraged Wes Elliot to get going and that payments could be made at $1million to $2millon at a time.

Soo Kim stated "We gotta move quickly man. We're gonna, wer're gonna spend, I think its gonna be million dollars at a time, Is it one, two, or three?  We go, we gotta go, we gotta build this thing, like yesterday, you know?"

Soo Kim confirmed that Sina was assigned to the project and Sina requested additional testing but Soo Kim stated that they were on the same page as to what they were trying to get done, in what order, and what it would cost.

WHEN:  July and August 2021

4.13     The representations made by Ballys were material as Plaintiff exclusively dealt with Ballys turning down other business opportunities.  Plaintiff incurred expenses and used resources to work towards the Project.  Soo Kim knew or should have known that Ballys did not intend to spend $10,000,00.00 as agreed to and budgeted for the project and knew or should have known that Ballys would require full control over the technology once the Commercial Product was developed.

4.14     Defendant failed to "exercise reasonable care" in making their promises related to payment and performance for the Project.

4.15     Plaintiff suffered a financial loss due as Plaintiff justifiably relied on Defendant's statements.  Plaintiff turned down an exclusive Commercial Agreement for $6,000,000.00 to be developed with certain influencers.  Plaintiff devoted resources and incurred costs in the Project.

**Fourth Cause of Action- Fraud/Fraud in the Inducement**

4.16   Defendant made representations and or failed to disclose material facts to Plaintiff

to induce Plaintiff to expend resources, abandon business opportunities, and work under SOW1

and SOW2.

4.17   Specific statements:

WHO:  Soo Kim and Adi Dhandia

WHAT:

"Thank you for this detailed SOW. It's what we need.  We are committed, and are willing to commit the budget you are asking for to get it done."

"You know you said Hey I need 10 million to develop this new thing right?...up to 10 million...for that I want the commercial use and you get the consumer use."

Soo Kim stated that he recognized that a portion of the $10,000,000.00 was for exclusivity.

Soo Kim stated that it was a fair deal.

Soo Kim stated that he understood that part of the money was for overhead for product already developed.

Soo Kim repeatedly expressed that they needed to "get going" and "we gotta build this thing like yesterday".

Soo Kim promised that they could assist with marketing by calling the Commercial Product "StrikeTec Bally's" or "Bally's StrikeTec".

Soo Kim confirmed he was "up to 10 million" and that the money was being spent to develop the commercial use.

Soo Kim stated that was "relatively fair".

Soo Kim confirmed the exclusivity of the deal and acknowledged that some overhead was paid for Wes Elliot's attention and exclusivity.

Soo Kim repeatedly expressed that this project needed to be completed very quickly and encouraged Wes Elliot to get going and that payments could be made at $1million to $2millon at a time.

Soo Kim stated "We gotta move quickly man. We're gonna, wer're gonna spend, I think its gonna be million dollars at a time, Is it one, two, or three? We go, we gotta go, we gotta build this thing, like yesterday, you know?"

Soo Kim confirmed that Sina was assigned to the project and Sina requested additional testing but Soo Kim stated that they were on the same page as to what they were trying to get done, in what order, and what it would cost.

Adi Dhanhania was copied on the communications from Soo Kim. Adi acted to coordinate development after the agreement to the Sows.

WHEN: July and August 2021

4.18   Soo Kim, Adi Dhandhania, and Sini Miri, through September 2021, sent emails, participated in phone calls, and Zoom meetings wherein representations and promises were made by Soo Kim that the $10,000,000.00 deal was fair, the concept was proven, exclusivity and the development of the existing platform was agreed to have value and was agreed to be part of the $10,000,000.00. No one from Ballys participating in those conversations, including Adi and Sini stated otherwise or advised EFD Sports, LLC otherwise, told EFD Sports, LLC that the SOWs were subject to later approval by Sam Miri, or that the License Agreement would attempt to gain control over the technology, including potential consumer use for price of $500,000.00 total.

4.19   Continuing assurances were made that payment would be no issue and that to keep EFD "in alignment with Bally's interests" the $10 million would need to be broken down into phases. EFD Sports complied.

4.20   Plaintiff relied on the misrepresentations made by Defendant to its detriment by foregoing other opportunities such as the EntroBox Agreement at the demand of Bally's to remain exclusive with Bally's until the completion of the Commercial Project. Soo Kim repeatedly made promises of payment, future marketing, and division of commercial from consumer, followed by repeated statements that the project needed to be completed "yesterday" and for EFD Sports to get going.

PLAINTIFF'S SECOND AMENDED COMPLAINT, Page 15

4.21    Adi and Sini never objected to Soo Kim's statements on the phone calls or thereafter, nor did they express that Bally's did not intend to pay the approved $10,000,000.00 for the Commercial Product any time prior to the presentation of the Licensing Agreement. The Licensing Agreement is evidence that Bally's never intended to acquire the Commercial Product for $10,000,000.00, but that they wanted control over the Software, Hardware, code, and derivative works to do with as they pleased, including marketing it themselves, in perpetuity, royalty free, for a cost of $500,000.00. The Licensing Agreement was to simply license the Commercial Product to Bally's for a fee until a date certain.

4.22    Bally's lied to EFD Sports by agreeing to the $10,000,000.00 cost, requiring exclusivity, continually promising payment, and then not paying EFD Sports and leveraging their position after a number of months while pressing EFD Sports to continue working without payment. Bally's made promises and representations to force EFD Sports to capitulate to their demands at a drastically reduced amount. When EFD Sports did not agree, Bally's terminated the project with no reasonable explanation. That is fraud.

4.23    Plaintiff was damaged by Defendant.

## ATTORNEYS FEES

5.1    Plaintiff seeks attorney's fees pursuant to Texas Civil Practice and Remedies Code §38.001.

## PRAYER

**WHEREFORE PREMISES CONSIDERED**, Plaintiff prays that upon final hearing that Plaintiff have such other and further relief general and special, legal and equitable to which Plaintiff may be justly entitled, including but not limited to:

1)    Actual damages;

PLAINTIFF'S SECOND AMENDED COMPLAINT, Page 16

2) Special damages

3) Consequential damages;  and

4) Reasonable and necessary attorney's fees, costs, and for the recovery of pre and post judgment interest as may be provided for by law.

Respectfully submitted,

*/s/Donald M. Kaiser Jr.*
Donald M. Kaiser Jr.
Texas State Bar No. 24025466
dkaiser@attorneysforbusiness.com


**KAISER LEGAL SOLUTIONS, PLLC**
5440 Harvest Hill Road
Suite 201
Dallas, Texas 75203
(214) 441-3000
(214) 441-3001 (fax)

**COUNSEL FOR PLAINTIFF**


## CERTIFICATE OF SERVICE

This is to certify that, on May 28, 2026, a true and correct copy of this document has been served on counsel of record in accordance with the Federal Rules of Civil Procedure.

*/s/Donald M. Kaiser Jr.*
Donald M. Kaiser Jr.